FILED
CLERK, U.S. DISTRICT COURT

NOV 12 2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ rsm _____ DEPUTY

JOSE FLORES
12814 Victory Blvd., Suite 378
North Hollywood, CA 91606
(818) 445 1769
info@globaleasytrade.com

Plaintiff in Pro Se

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

**2:22-CV-08274-MWF-KSx**

| | |
|---|---|
| JOSE FLORES, an individual | Case Number: |
| | District Judge: |
| *Plaintiff* | Courtroom: |
| *Vs.* | |
| COINBASE, INC., COINBASE GLOBAL, INC., BRIAN ARMSTRONG and DOES 1 through 10, inclusive, | COMPLAINT FOR DAMAGES DEMAND FOR JURY TRIAL DEMAND FOR PUNITIVE DAMAGES |
| *Defendants.* | |

i

# TABLE OF CONTENTS

**Pages**

INTRODUCTION ............................................................................1

PARTIES .......................................................................................4

JURISDICTION AND VENUE ........................................................5

SUBSTANTIVE ALLEGATIONS ...................................................7

I.      DIGITAL ASSETS, COINBASE, AND CRYPTO-SECURITIES ............7

    A. The Blockchain and The Foundations of Digital Assets .......................7

    B. Crypto-Exchanges and Coinbase .............................................10

    C. Crypto-Securities and Centralization .......................................15

    D. Coinbase's Failure to Register as a Securities Exchange

       or Broker-Dealer ................................................................25

II.    COINBASE LISTS AND SELLS SECURITIES BUT IS NOT
      REGISTERED AS A SECURITIES EXCHANGE ...................................29

    A. DIGITAL ASSETS LISTED ON COINBASE ARE SECURITIES .....29

       1. 1INCH ...........................................................................30

       2. AAVE ............................................................................30

       3. ACH ..............................................................................30

       4. ADA ..............................................................................30

       5. AGLD ............................................................................30

       6. ALGO ............................................................................31

7. AMP ............................................................................................ 31

8. ANKR ........................................................................................... 31

9. ARPA .......................................................................................... 31

10. ATOM ........................................................................................ 32

11. AUCTION ................................................................................... 32

12. AXS ........................................................................................... 32

13. BAL ........................................................................................... 32

14. BAND ........................................................................................ 32

15. BAT ........................................................................................... 33

16. BNT ........................................................................................... 33

17. BOND ........................................................................................ 33

18. BTRST ....................................................................................... 33

19. CGLD ........................................................................................ 33

20. CLV ........................................................................................... 34

21. COMP ........................................................................................ 33

22. CRO ........................................................................................... 34

23. CRV ........................................................................................... 35

24. CTSI .......................................................................................... 35

25. CVC ........................................................................................... 35

26. DNT ........................................................................................... 35

27. DOGE ........................................................................................ 35

28. DOT ................................................................... 35

29. ENJ ................................................................... 36

30. EOS ................................................................... 36

31. FARM ................................................................. 36

32. FET ................................................................... 37

33. FIL .................................................................... 37

34. FORTH ............................................................... 37

35. GNT .................................................................. 37

36. GRT .................................................................. 37

37. GTC .................................................................. 38

38. ICP ................................................................... 38

39. IOTX ................................................................. 38

40. KEEP ................................................................. 38

41. KNC .................................................................. 38

42. LINK ................................................................. 39

43. LOOM ............................................................... 39

44. LRC .................................................................. 39

45. MANA ............................................................... 39

46. MATIC ............................................................... 40

47. MKR ................................................................. 40

48. MLN ................................................................. 40

49. NKN ................................................................................ 40

50. NMR ............................................................................... 40

51. NU ................................................................................. 41

52. OGN ............................................................................... 41

53. OMG ............................................................................... 41

54. ORN ............................................................................... 41

55. OXT ............................................................................... 41

56. PLA ............................................................................... 42

57. POLY .............................................................................. 42

58. QNT ............................................................................... 42

59. QUICK ............................................................................ 42

60. RARI .............................................................................. 42

61. REN ............................................................................... 43

62. REP ............................................................................... 43

63. RLC ............................................................................... 43

64. SHIB .............................................................................. 43

65. SKL ............................................................................... 43

66. SNX ............................................................................... 44

67. SOL ............................................................................... 44

68. STORJ ............................................................................. 44

69. SUSHI ............................................................................. 44

70. TRB ................................................................44

71. TRIBE ..............................................................45

72. UMA ................................................................45

73. UNI .................................................................45

74. XLM ................................................................45

75. XRP ................................................................46

76. XTZ ................................................................46

77. XYO ................................................................46

78. YFI .................................................................46

79. ZRX ................................................................47

80. GYEN……………………………………………………………47

B. COINBASE OFFERS AND SELLS UNREGISTERED
SECURITIES ........................................................48

C. THE COINBASE EXCHANGES ARE RULE 3b-16(a) SYSTEMS
AND THEREFORE, ARE UNREGISTERED "EXCHANGES"
UNDER THE EXCHANGE ACT ...............................49

D. COINBASE OPERATES AS AN UNREGISTERED BROKER-
DEALER ON THE COINBASE EXCHANGES ...................50

III. CLAIMS FOR RELIEF ...............................................52

IV. FIRST CAUSE OF ACTION .........................................52

V. SECOND CAUSE OF ACTION ………………………………......55

VI.    THRID CAUSE OF ACTION …………………………….......59

VII.   FOURTH CAUSE OF ACTION …………………………........62

VIII.  FIFTH CAUSE OF ACTION…………………………………65

IX.    SIXTH CAUSE OF ACTION …………………………………68

X.     SEVENTH CAUSE OF ACTION ……………………………72

XI.    EIGHTH CAUSE OF ACTION …………………………….......75

XII.   NINTH CAUSE OF ACTION ……………………….............78

XIII.  TENTH CAUSE OF ACTION …………………………….....81

XIV.   ELENTH CAUSE OF ACTION……………………………….84

XV.    THE ARBITRATION CLAUSE IS UNENFORCEABLE………………87

       A. Unconscionability…………………………………………...89

       B. Severance…………………………………………………... 99

XVI.   PRAYER FOR RELIEF ...........................................................101

XVII.  DEMAND FOR PUNITIVE DAMAGES ................................ 103

XVIII. DEMAND FOR JURY TRIAL ………………………………103

Comes now Plaintiff Jose Flores hereby "Flores or Plaintiff" individually files his Complaint for money damages, alleging the following against defendants Coinbase Global, Inc. ("Coinbase Global"), Coinbase, Inc. (together with Coinbase Global, "Coinbase"), and Brian Armstrong (collectively with Coinbase Global and Coinbase, Inc., "Defendants"), based on personal knowledge, the investigation, and information and belief. Plaintiffs believe substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **INTRODUCTION**

1.      Coinbase is an American company that created and operates a website from which customers can buy and sell digital assets. During the period between September 28, 2020 and the present (the "Material Period"), Coinbase has used this platform to buy from and sell to customers 80 different digital assets at issue in this <u>action</u>[1]. But what Coinbase has not disclosed is that the Tokens are in fact securities, and Coinbase is selling these securities despite the fact that there is no registration statement in effect for these securities and despite the fact that Coinbase has refused to register either as a securities exchange or as a broker-

---

[1] Specifically, this action concerns the digital assets traded under the following symbols: 1INCH, AAVE, ACH, ADA, AGLD, ALGO, AMP, ANKR, ARPA, ATOM, AUCTION, AXS, BAL, BAND, BAT, BNT, BOND, BTRST, CGLD, CLV, COMP, CRO, CRV, CTSI, CVC, DNT, DOGE, DOT, ENJ, EOS, FARM, FET, FIL, FORTH, GNT, GRT, GTC, ICP, IOTX, KEEP, KNC,LINK, LOOM, LRC, MANA, MATIC, MKR, MLN, NKN, NMR, NU, OGN, OMG, ORN, OXT,PLA, POLY, QNT, QUICK, RARI, REN, REP, RLC, SHIB, SKL, SNX, SOL, STORJ, SUSHI,TRB, TRIBE, UMA, UNI, XLM, XRP, XTZ, XYO, YFI, ZRX, GYEN. These assets are referred to collectively as the "Tokens."

1

---

COMPLAINT FOR DAMAGES                                    Case No:

dealer. Because Coinbase's sale of these tokens violates both federal and state law, Plaintiffs, individually and personally transacted in the Tokens on the Coinbase Platform (as defined herein) and the Coinbase Pro Platform (as defined herein) during the Material Period, Plaintiff bring claims to recover damages, consideration paid for Tokens, trading fees and realized gains during trading taken away by defendants, together with interest thereon, as well as attorneys' fees and costs, to the fullest extent permitted by law.

2.     Coinbase sells digital assets or "crypto-assets" that exist on a blockchain, which is a decentralized digital ledger that records all transactions. Following the creation of Bitcoin, which was the first prominent digital asset, the number of digital assets has increased dramatically. There are many different kinds of crypto assets; some closely resemble Bitcoin or other commodities; in that they are decentralized. For decentralized commodities, prices may rise or fall based upon supply and demand, but there is no centralized mechanism for creating more such commodities.

3.     By contrast, other digital assets are similar to traditional securities in that they represent one's investment in a project that is to be undertaken with the funds raised through the sale of the tokens. Like traditional securities, investors purchase these tokens with the hope that their value will increase as the issuer that created the token uses its managerial efforts to create some use—typically

COMPLAINT FOR DAMAGES                                    Case No:

described to investors in a "whitepaper"—that will give the token value. This similarity with traditional securities is enhanced by the fact that these tokens are offered to the public in an Initial Coin Offering ("ICO") that is modeled on the IPO of a traditional security.

4.      But, despite the fact that each of the Tokens is a security, none of them is registered with the U.S. Securities and Exchange Commission ("SEC") or with state regulators. This means that purchasers do not have access to the disclosures that accompany the issuances of traditional securities. Rather, investors receive—at most—only the so-called whitepapers, which describe the token, but do not satisfy the requirements for a prospectus under federal and state securities laws. These whitepapers are often supplemented by advertisements and social media postings that promote the token, including giveaways and other promotions.

5.      Coinbase operates two digital asset trading exchanges: Coinbase (the "Coinbase Platform") and Coinbase Pro (the "Coinbase Pro Platform" and collectively with the Coinbase Platform, the "Coinbase Exchanges"). Crypto securities, including the Tokens, have been and continue to be sold on the Coinbase Exchanges. Because Coinbase brings together buy and sell orders for the Tokens and the Tokens are securities, the Coinbase Exchanges are securities exchanges, but Coinbase has not registered as a securities exchange under federal or state law and is not subject to any exemption from such registration. Indeed,

3

SEC chair Gary Gensler recently told the Senate Banking Committee that Coinbase had not registered with the SEC, "even though they have dozens of tokens that are securities."

6.      In addition, Coinbase is an intermediary in every transaction it effects, in contrast to electronic "bulletin boards" such as Craigslist, which match a buyer and seller. Coinbase stands between the buyer and seller in each trade on its platform, meaning that is the actual seller of the unregistered securities that transact each day on its platform. Coinbase's operating as an unregistered broker-dealer and exchange on which securities transact, and its offer and sale to investors of those securities, violates federal and state securities laws.

## **PARTIES**

7.      Plaintiff Jose Flores is a citizen and resident of California. During the Material Period, Flores transacted in a number of the Tokens on the Coinbase Exchanges from California.

8.      Defendant **Coinbase Global, Inc**. is a Delaware corporation.

9.      Defendant **Coinbase, Inc**. is a Delaware corporation that is a <u>wholly owned</u> subsidiary of Coinbase Global, Inc. Coinbase Global and Coinbase, Inc. are operated as one corporation, and users have no visibility into which entity they are transacting with. Indeed, Coinbase refers to the two entities jointly as the

4

"Company" in its SEC filings. Coinbase, Inc. and Coinbase Global share an office in New York City.

10.     Defendant **Brian Armstrong** is the founder of Coinbase and the CEO of both Coinbase Global and Coinbase, Inc. Upon information and belief, he is a citizen and resident of California. He has been reported to own a 19-percent stake in Coinbase. He has consistent and daily management of Coinbase's operations, including the decision not to register as a securities exchange or a broker-dealer and the decision to list unregistered securities, including the Tokens. Armstrong has repeatedly and publicly discussed his role in Coinbase, including his disagreements with the SEC's enforcement of securities laws against Coinbase.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), because the claims in this action exceed the minimum required amounts exclusive of interest and costs, the Plaintiff is a citizen of a state different from Defendants.

12.     Jurisdiction of this Court is further founded upon 28 U.S.C. § 1331 because the Amended Complaint asserts claims under Sections 5 and 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o.

COMPLAINT FOR DAMAGES                                    Case No:

This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

13.     Jurisdiction of this Court is also founded upon Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5,15(a)(1) and 29(b), 15 U.S.C. §§ 77e, 78o(a)(1), 78cc(b).

14.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. §1965, because Defendants transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to this complaint took place in this District. In particular, Coinbase has an office located in New York City. Armstrong has also often traveled to New York City to promote Coinbase, including attending crypto-conference Consensus 2019 in May 2019, and attending a conference dedicated to non-fungible tokens ("NFTs") in November 2021.

15.     The Court has personal jurisdiction over Defendants. Defendants transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and

have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

16.     The Court also had personal jurisdiction over Defendants and proper venue over this action under the nationwide service of process provisions of Section 22 of the Securities Act, 15 U.S.C. § 77v.

## SUBSTANTIVE ALLEGATIONS

## I.     DIGITAL ASSETS, COINBASE, AND CRYPTO-SECURITIES

### A.     The Blockchain and The Foundations of Digital Assets

17.     This case concerns crypto assets[2]. Crypto assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer. The key technology allowing the creation of crypto assets is the blockchain.

18.     The challenge that had previously prevented the creation of digital assets is the need to allow for secure transfers to exactly one recipient at a time. In general, digital files are transmitted by duplication; if someone emails a

photograph to a friend, both the sender and the recipient now have copies of the photograph. While that duplication is helpful for a photograph, it would quickly

---

[2] One commonly used umbrella term that collectively describes the many different types of digital assets and the many hundreds of digital tokens in circulation is "cryptocurrencies." In order to avoid embedding any assumptions about the nature of these assets in this umbrella term, Plaintiffs herein use the term "crypto-assets" to describe the full range of digital assets.

7

make any digital asset valueless through duplication and inflation, as one individual could send the same digital asset to many counterparties. The elaborate. measures used to prevent counterfeiting of physical currencies do not have effective digital analogues.

19.     Bitcoin, which was the first prominent digital asset, solved this problem with a digital ledger system called the "blockchain," which tracks the ownership and transfer of every Bitcoin in existence. Each Bitcoin user has a digital "address" used to receive Bitcoin. The Bitcoin blockchain lists, publicly, every address and the number of Bitcoin associated with that address. By looking at the blockchain, anyone can see every Bitcoin transaction in which that address has engaged. providing a full transaction history of each Bitcoin, the blockchain allows for the secure exchange of all Bitcoin. Any attempt to duplicate a Bitcoin or to transfer it to multiple people at once would be futile, because a Bitcoin user could use the blockchain to verify each transaction involving that Bitcoin. There is thus no effective way to counterfeit Bitcoin.

20.     The blockchain has become the foundational technology for crypto assets. While crypto assets vary tremendously, they generally rely on the blockchain to ensure that transactions are secure and non-duplicable.

21.     Control of crypto assets is attested primarily through control of cryptographic keys. These cryptographic keys have two components: a public key

COMPLAINT FOR DAMAGES                                        Case No:

and a private key. This cryptographic system of transfer and exchange is generally the same across most crypto assets.

22.     To use Bitcoin as an example, the public key is used to produce the Bitcoin address. A Bitcoin address is a destination for transfers of Bitcoin, like the account number of a conventional bank account. Bitcoin addresses are long strings of alphanumeric text, often abbreviated by a small group of numbers and letters appearing in the string, such as 1s5F or R3w9. A private key allows the owner of a Bitcoin address to access it, like a long PIN or password for a conventional bank account.

23.     Those who wish to transfer Bitcoin need to know the recipient's Bitcoin address, just as one transferring funds to a conventional bank account needs to know the account number for that account. When they have the recipient's address, transferors can use their private keys to authorize the transfer of Bitcoin, just as one would use a PIN or password to authorize a transfer between traditional bank accounts.

24.     A transfer of Bitcoin is public to the extent that anyone can see the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred. That is, anyone could see that Bitcoin address 1s5F transferred 10.3 Bitcoin to Bitcoin address R3w9. The names of the individuals or entities that

COMPLAINT FOR DAMAGES                              Case No:

control these addresses, on the other hand, are not recorded on the blockchain and not accessible to the public.

### B.       Crypto-Exchanges and Coinbase

25.       While the blockchain allows for secure and non-duplicable transfers of digital assets, it does not do anything to connect users to each other or to automate both sides of a transfer. The desire for locations that enabled the trading of digital assets led to the creation of crypto exchanges. Crypto exchanges emerged to enable smoother and faster trading between investors, just as stock and commodities exchanges emerged to enable easy trading of securities.

26.       There are two primary types of crypto exchange: decentralized exchanges and centralized exchanges.

27.       Decentralized exchanges may use the blockchain itself to match and execute transactions among traders. There is no intermediary individual or corporation that matches or clears transactions; instead, they use a blockchain technology called a "smart contract" to automatically facilitate trading. While different decentralized exchanges use different approaches, what they have in common is that the crypto assets are transferred between individual accounts. Thus, if Angela exchanges one Bitcoin for 10 Ethereum using a decentralized

COMPLAINT FOR DAMAGES                              Case No:

exchange, her one Bitcoin will be sent to Brian, another user on the platform, and Brian's 10 Ethereum will be sent to Angela.

28.     These decentralized exchanges resemble Craigslist in their operation. Just like a purchase of a collectible baseball card on Craigslist involves one user sending money and the other sending the card, so too do transactions on decentralized exchanges involve customers sending each other the goods being transacted. These decentralized exchanges, like Craigslist, do not own or hold the assets in question—they simply provide a platform for exchanges between users, along with some features designed to facilitate trading (*e.g.*, Craigslist's creation and maintenance of message boards organized by product type or a decentralized exchange's smart contracts), possibly in exchange for advertising revenue or a transaction fee.

29.     The other type of crypto-exchange—which includes the Coinbase Exchanges—is the centralized exchange. When a customer wishes to trade crypto assets on a centralized exchange, she must first create an account on that exchange. The exchange will then provide that customer with a deposit address that the exchange controls. When the customer deposits crypto assets into that deposit address, the exchange will credit her trading account with the corresponding crypto asset. The exchange will typically then transfer the crypto assets into one of its other addresses for storage.

COMPLAINT FOR DAMAGES                                    Case No:

30.     The trades conducted within that exchange, however, do not in fact happen on the blockchain and do not actually involve the transfer of any assets between users. Instead, it is Coinbase that faces both the buyer and the seller. Thus, if Angela wishes to trade one Bitcoin for 10 Ethereum on Coinbase, Coinbase will update its internal records to debit Angela's account one Bitcoin and credit it 10 Ethereum; no actual crypto assets are moved on the blockchain. Nor is there any sense in which Angela's Bitcoin is transferred to anyone other than Coinbase: while Coinbase may use other traders' orders to determine the relative prices of crypto-assets and the rate at which they are exchanged, the only actual transactions that occur are between (a) the buyer and Coinbase and (b) the seller and Coinbase. The buyer and seller are *not* in privity with one another. When a user wants to withdraw crypto-assets from Coinbase or another centralized exchange, she tells the exchange the address into which she would like her crypto-assets transferred. The exchange then debits the user's account and transfers a corresponding amount of crypto asset from the *exchange's* reserves to that address. The withdrawn assets come directly from the centralized exchange.

31.     Both of the Coinbase Exchanges operate as centralized exchanges. They differ in the services and fees involved, but both place all deposited assets into a centralized wallet and reflect transactions only through internal updates to each customer's account.

12

32.     The Coinbase Platform, which is marketed towards newer users, allows users to place only market orders. That is, Coinbase Platform users can place orders to buy, sell, or exchange digital assets at the digital assets' market price as displayed on the Coinbase Platform at the time of placement of the order.

33.     The following tables show the fees charged by Coinbase on the Coinbase Platform:

### FLAT FEES

| TOTAL TRANSACTION AMOUNT | TRANSACTION FEE |
|---|---|
| $10 or less | $0.99 |
| More than $10, less than or equal to $25 | $1.49 |
| More than $25, less than or equal to $50 | $1.99 |
| More than $50, less than or equal to $200 | $2.99 |

### VARIABLE FEES

| PAYMENT METHOD (PURCHASE) OR PAYOUT METHOD (SALE) | EFFECTIVE RATE OF CONVERSION FEE (AFTER WAIVER) |
|---|---|
| UNITED STATES BANK ACCOUNT | 1.49% |
| COINBASE USD WALLET | 1.49% |
| DEBIT CARD BUY | 3.99% |

13

---

COMPLAINT FOR DAMAGES                          Case No:

| INSTANT CARD WITHDRAWAL | Up to 1.5% of any transaction and a minimum fee of $0.55. |
|---|---|

34.     The Coinbase Pro Platform is designed for use by advanced and active digital asset traders. The Coinbase Pro Platform allows individuals to place three types of orders: a market order to buy or sell a digital asset at the best available price; a limit order to buy or sell a digital asset at a specific price or better, or a stop order to buy or sell a digital asset if the market price of the digital asset falls to a specified price.

35.     The Coinbase Pro Platform employs a volume-tiered, "maker-taker" fee schedule. Orders that provide liquidity ("maker" orders) are charged different fees than orders that take liquidity ("taker" orders). A Coinbase Pro Platform user's fee tier is based upon total dollar value trading volume over the trailing 30-day period.

36.     A Coinbase Pro Platform user whose order is matched immediately with an order already on the order book is considered a "taker" because they have "taken" an order off the order book and removed liquidity from the market. A Coinbase Pro Platform user whose order is not matched immediately with an order on the order book is considered a "maker", because their order is placed on the order book and provides market liquidity.

14

COMPLAINT FOR DAMAGES                                    Case No:

37.    The Coinbase Pro Platform Maker-Taker fee schedule is as follows:

| PRICING TIER | TAKER FEE | MAKER FEE |
|---|---|---|
| Under $10,000 | 0.50% | 0.50% |
| $ 10,000        $ 50,000 | 0.35% | 0.35% |
| $ 50,000        $ 100,000 | 0.25% | 0.15% |
| $ 100,000 -  $ 1 Million | 0.20% | 0.10% |
| $1 Million - $ 20 Million | 0.18% | 0.08% |
| $ 20 Million-$ 100 Million | 0.15% | 0.05% |
| $ 100 Million - $ 300 Million | 0.10% | 0.02% |
| $ 300 Million - $ 500 Million | 0.08% | 0.00% |
| $ 500 Million - $ 750 Million | 0.06% | 0.00% |
| $ 750 Million -$ 1 Billion | 0.05% | 0.00% |
| $ 1 Billion | 0.04% | 0.00% |

38.    Brian Armstrong, as the founder and current CEO of Coinbase, was involved in the decision to run the Coinbase Exchanges as centralized exchanges. Both Coinbase Exchanges have been centralized from the time they were founded by Armstrong.

**C.    Crypto-Securities and Centralization**

COMPLAINT FOR DAMAGES                              Case No:

39.     Bitcoin, in addition to pioneering the use of the blockchain, is also notable for being decentralized and having a limited supply. These features are core to the idea of Bitcoin, but, unlike the blockchain, are not universal among crypto assets generally.

40.     Bitcoin maintains its blockchain and provides for new Bitcoin to enter the economy through a consensus mechanism known as "mining." Individuals "mine" Bitcoin by having sophisticated computer programs perform complex, resource-intensive automated verifications of past transactions, which are then added to the blockchain. Those who mine Bitcoin— "miners"—are rewarded with new Bitcoin.

41.     The mining process creates a scarcity that underlies the value of Bitcoin. Bitcoin is designed so it gets harder and harder to mine. The more Bitcoin produced, the more complex and resource-intensive the computations required for a miner to receive new Bitcoin. This process ensures that the supply of Bitcoin will not rise sharply or unpredictably, thus preventing a flood of new Bitcoin that could undercut the value of the preexisting Bitcoin. Likewise, the number of Bitcoin that miners receive as a reward is halved roughly every four years. This will continue until all Bitcoin have been mined, at which point miners will receive fees paid solely by network users.

COMPLAINT FOR DAMAGES                                    Case No:

42.     Bitcoin's distribution system thus roughly mirrors the availability of natural resources like gold or silver. While the supply of Bitcoin continues to grow as more of it is mined, the growth rate of that supply is logarithmic and will eventually cease entirely, ensuring the market is not flooded and Bitcoin is not devalued. This ensures market participants that their Bitcoin will not diminish in value due to sudden inflation.

43.     Bitcoin's architecture ensures that it is entirely decentralized. The Bitcoin protocol was first released on October 31, 2008 through a whitepaper authored under the pseudonym Satoshi Nakamoto. That paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust." While the first 50 Bitcoin were mined into existence by Satoshi Nakamoto three months after the release of the whitepaper, it has since attracted a community of many competing miners who work to ensure the decentralization of the network.

44.     Accordingly, there is no "Bitcoin Inc." that administers or manages Bitcoin as a whole. If Bitcoin were run on centralized servers, the underlying value of Bitcoin would rely on the trust that individuals had in those operating the centralized servers. If Bitcoin's creator could issue more Bitcoin at a whim, the value of Bitcoin would reflect that uncertainty. But because Bitcoin's

COMPLAINT FOR DAMAGES                          Case No:

cryptographic protocols are self-sustaining and cannot be affected by the originator, the success of Bitcoin does not hinge on any single entity.

45.     This decentralization distinguishes Bitcoin from other assets. The value of corporate stocks and bonds, regardless of their structure, is tied to the success of the issuing corporation. The value of government bonds is tied to the credit of the government that issues them. The value of a fiat currency is tied to the issuing nation, reflecting factors like its economy, political stability, and the practices of its central bank. None of this is true for Bitcoin.

46.     The controlled supply and decentralized nature of Bitcoin is shared with some other crypto-assets, including Ethereum, which has become the second-largest crypto-asset by maker volume. Because of their decentralized nature, Bitcoin and Ethereum have been recognized as commodities by courts and regulators.[3]

47.     Other crypto assets, however, are centralized and do not have a controlled supply. Stable coins, for example, are intended to mirror real-world assets, such as the U.S. dollar or the price of gold. These stable coins can be created and managed by a single entity that has the power to create new coins on

_____

[3] *See, e.g.*, *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y.), *adhered to on denial of reconsideration,* 321 F. Supp. 3d 366 (E.D.N.Y. 2018)

COMPLAINT FOR DAMAGES                                    Case No:

demand; the value of these coins derives from the promise that the issuing entity will maintain a reserve of the asset to which the stable coin is pegged and only issue new coins in response to new deposits into the reserve. Coinbase created and manages one such stable coin, known as USDC.

48. Another type of crypto-asset is the token or crypto-security. These crypto assets are centralized and are not generated by mining or a similar decentralized process. Instead, they are generally created by a company, known as an issuer.

49. Often, a crypto security will begin with an initial coin offering, or "ICO." This ICO will allow members of the public to buy tokens directly from the issuer. On other occasions, the issuer will distribute some tokens for free to users in an "airdrop" and then begin selling the tokens on the secondary market through one or more exchanges. Regardless, the tokens, which were generated by the issuer themselves, do not derive value through algorithmic scarcity (and are thus unlike Bitcoin and Ethereum) and are not backed by a reserve (and are thus unlike stable coins).

50. Instead, the nominal value proposition of a token comes from the promise that the issuer will use the funds raised in the ICO to create an ecosystem in which the token is useful; the token would then become valuable because it could be sold to those who wish to engage with the new ecosystem. In reality,

19

many tokens issued during an ICO never have an actual use case because the issuer never actually creates the relevant ecosystem; even for the tokens that eventually acquire a nominal use, those tokens are overwhelmingly used to trade and possessed by individuals who will never interact with the ecosystem for which they are designed, but instead acquire the tokens to speculate on their future market value. In this way, they are similar to traditional securities, which entitle owners to voting rights for the board of directors but are often owned by those with no intention of casting such a vote and who hope to profit from the managerial efforts of those running the issuer.

51.    The tokens issued in these ICOs are therefore investment contracts and securities because they represent the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. Investors invest money by purchasing the tokens. The investors are participating in a common enterprise because their collective purchases fund the creation of the ecosystem that will supposedly give value to the tokens they have purchased.

(recognizing that Bitcoin can be regulated as commodity). On August 14, 2021, CFTC Commissioner Brian Quintenz stated on Twitter that Ethereum was "a non-security commodity." Brian Quintenz (@CFTCquintenz), Twitter (Aug. 14, 2021), https://web.archive.org/web/20220311133718/https://twitter.com/CFTCquintenz/status/1426570174036168704?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1426570174036168704%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.ledgerinsights.com%2Fcftc-commissioner-clarifies-role-in-digital-assets-regulation%2F.

They expect profits by reselling the tokens to others at a higher price when the ecosystem is created. And they depend on the efforts of the issuer to create that ecosystem

52.     Because these tokens are securities, the SEC has repeatedly both provided guidance and engaged in enforcement actions on that basis. The SEC first examined how digital assets could qualify as securities under existing law in the SEC's *Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934: The DAO* (the "2017 DAO <u>Report</u>")[4]. In the 2017 DAO Report, the SEC examined the application of the Securities Act and the Exchange Act to the issuance and trading of digital assets.

53.     With respect to the application of the Securities Act to digital assets, the SEC concluded (1) that digital assets may qualify as securities pursuant to the Securities Act and the test articulated in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and that (2) issuers of digital assets that fit within the definition of security

---

[4] *Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934: The DAO,* SECURITIES AND EXCHANGE COMMISSION (Jul. 25, 2017), https://web.archive.org/web/20220306215515/https://www.sec.gov/litigation/investreport/34-81207.pdf ("2017 DAO Report").

[5] The 2017 DAO report explained that "information about The DAO was 'crucial' to the DAO Token holders' investment decision." *Id.* at 16 (citing *SEC v. Murphy*, 626 F.2d 633, 643 (9th Cir.1980)). "The DAO was 'responsible for the success or failure of the enterprise,' and accordingly was the entity about which the investors needed information material to their investment decision."*Id.* (quoting *Murphy*, 626 F.2d at 643–44). [6] *Id.* at 17.

COMPLAINT FOR DAMAGES                          Case No:

under the *Howey* test are subject to the registration and reporting requirements of the Securities <u>Act</u>.[5]

54.     Similarly, the SEC concluded that digital asset trading platforms may satisfy the meaning of "exchange" as defined by the Exchange Act if they "provide[] users with an electronic system that matched orders from multiple parties to buy and sell [digital assets] for execution based on non-discretionary <u>methods</u>."[6] The SEC noted that a "system that meets the criteria of Rule 3b-16(a), and is not excluded under Rule 3b16(b), must register as a national securities exchange pursuant to Sections 5 and 6 of the Exchange Act or operate pursuant to an appropriate exemption."

55.     Following an ICO boom in 2017, the SEC issued further guidance as to the application of the *Howey* test to digital assets in a 2019 report entitled *Framework for "Investment Contract" Analysis of Digital Assets (the "Howey Framework <u>Report</u>"*[7] The report reiterated that whether a particular digital asset is an investment contract, and thus a security, requires an analysis of the facts and circumstances surrounding the digital asset's creation and issuance.

---

[6] *Id*. at 17.

[7] *Framework for "Investment Contract" Analysis of Digital Assets,* SECURITIES AND EXCHANGE COMMISSION (Apr. 3, 2019), https://archive.ph/4wS5f ("Howey Framework Report").

22

56.     Following this guidance, the SEC has engaged in enforcement actions on the basis that several different tokens are in fact securities. On September 30, 2019, Block.one, the issuer of the EOS digital asset (one of the Tokens in this action), agreed to pay $24 million to settle charges that it had raised several billion dollars through an unregistered securities offering when it conducted the ICO for the EOS token[8] Similarly, on December 22, 2020, the SEC brought charges against Ripple Labs Inc. and two of its executives, alleging that they had raised over $1.3 billion through an unregistered crypto-securities offering through the ICO of XRP (another of the Tokens in this action[9]). The case is ongoing.

57.     On July 21, 2021, speaking to the American Bar Association, SEC Chairman Gensler commented on the fact that digital asset trading platforms were offering tokens that are priced off of securities and resemble derivatives, stating:

> "Make no mistake: It doesn't matter whether it's a stock token, a stable value token backed by securities, or any other virtual product that provides synthetic exposure to underlying securities. These platforms—whether in the decentralized or centralized finance space—are implicated by the securities laws and must work within

---

[8] *See SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO*, U.S. SECURITIES AND EXCHANGE COMMISSION (Sept. 30, 2019), https://web.archive.org/web/20220311134238/https://www.sec.gov/news/press-release/2019-202.

[9] *See SEC Charges Ripple and Two Executives with Conducting $1.3 Billion Unregistered Securities Offering*, U.S. SECURITIES AND EXCHANGE COMMISSION (Dec. 22, 2020), https://web.archive.org/web/20220307145723/https://www.sec.gov/news/press-release/2020-338.

23

---

COMPLAINT FOR DAMAGES                                    Case No:

our securities <u>regime.</u>"[10]

58.     On August 3, 2021, SEC Chairman Gensler commented on the state of the digital asset market:

> [R]ight now, we just don't have enough investor protection in crypto … [f]rankly, at this time, it's more like the Wild West … I believe we have a crypto market now where many tokens may be unregistered securities, without required disclosures or market oversight … [t]his leaves prices open to manipulation. This leaves investors vulnerable …. ***While each token's legal status depends on its own facts and circumstances, the probability is quite remote that, with 50 or 100 tokens, any given platform has zero <u>securities</u>***[11].

59.     As digital asset popularity exploded, Coinbase listed digital assets, including the Tokens, that qualify as investment contracts, and thus securities, in order to earn fees from user transactions in these assets. Coinbase listed these Tokens despite knowledge of their status as securities.

60.     Coinbase's CEO, Brian Armstrong, has directly commented on the possibility that Coinbase may be selling securities. In September 2021, in response to an SEC enforcement action regarding a Coinbase lending program, Armstrong

---

[10] Nikhilesh De, *SEC Chair Hints Some Stablecoins Are Securities,* NASDAQ (July 21, 2021), https://web.archive.org/web/20220311134752/https://www.nasdaq.com/articles/sec-chair-hintssome-stablecoins-are-securities-2021-07-21.

[11] Will Gottsegen, *SEC's Gensler: Crypto Market Filled with Unregistered Securities, Prices 'Open to Manipulation'*, DECRYPT (Aug. 3, 2021), https://web.archive.org/web/20220311134929/https://decrypt.co/77574/gary-gensler-cryptomarket-securities-aspen-institute (emphasis added).

COMPLAINT FOR DAMAGES                    Case No:

tweeted that the SEC was engaging in "sketchy behavior." He criticized the SEC for objecting to Coinbase's crypto-backed lending program and noted that he had attempted to meet with the SEC to discuss the issue. Coinbase nonetheless cancelled the SEC-challenged program. But Armstrong did not register Coinbase as a securities exchange or a broker-dealer under state or federal law.

### D. Coinbase's Failure to Register as a Securities Exchange or Broker-Dealer

61. Despite selling tokens that are crypto-securities, Coinbase has not registered as a securities exchange or broker-dealer. Indeed, on September 14, 2021, SEC Chairman Gary Gensler spoke at a Senate Banking Committee hearing and noted that the Coinbase Exchanges have not registered as national securities exchanges "even though they have dozens of tokens that might be securities[12]"

62. Each of the Coinbase Exchanges is a securities exchange as the term is defined in the Exchange Act. Section 3(a)(1) of the Exchange Act defines the term "exchange" as:

> any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a marketplace or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the marketplace

[12] Jeff John Roberts, *SEC Chair: Coinbase Lists 'Dozens of Tokens that Might Be* Securities', Decrypt (Sept. 14, 2021), https://web.archive.org/web/20220311192025/https://decrypt.co/80924/gensler-coinbase-secsecurities.

25

and the market facilities maintained by such exchange. 15 U.S.C. § 78c.

63.     According to the Exchange Act, any organization, association, or group operating as an Exchange must register as a "national securities exchange" with the SEC and must make periodic disclosures to the SEC, unless the SEC determines an exemption is warranted.

64.     Section 5 of the of the Exchange Act makes failing to comply with the Exchange Act's registration and reporting requirements illegal:

> It shall be unlawful for any broker, dealer, *or exchange*, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security, or to report any such transaction, unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration upon application by the exchange because, in the opinion of the Commission, by reason of the limited volume of transactions effected on such exchange, it is not practicable and not necessary or appropriate in the public interest or for the protection of investors to require such registration. 15 U.S. Code § 78e - Transactions on unregistered exchanges (emphasis added).

65.     Exchange Act Rule 3b-16(a) provides a functional test to assess whether a trading system meets the definition of exchange under Section 3(a)(1) of the Exchange Act. Exchange Act Rule 3b-16(a) provides that an organization, association, or group of persons shall be considered to constitute, maintain, or provide "a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by an exchange" as those terms are used in Section 3(a)(1) of the Exchange Act if such an organization, association, or group of persons: (1)

26

brings together the orders for securities of multiple buyers and sellers; and (2) uses established, nondiscretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of the trade.[13]

66.     A system that meets the criteria of Exchange Act Rule 3b-16(a), and that is not excluded under Exchange Act Rule 3b-16(b), must register, pursuant to Section 5 of the Exchange Act, as a national securities exchange under Section 6 of the Exchange Act[14] or operate pursuant to an appropriate exemption One of the available exemptions is for Alternative Trading Systems, or "ATS."[15] Exchange Act Rule 3a1-1(a)(2) exempts from the definition of "exchange" under Section 3(a)(1) an organization, association, or group of persons that complies with Regulation ATS.[16]

---

[13] *See* 17 CFR § 240.3b-16(a). The purpose of Rule 3b-16(b) is to explicitly exclude certain systems that the SEC believed did not meet the exchange definition. These systems include systems that merely route orders to other execution facilities and systems that allow persons to enter orders for execution against the bids and offers of a single dealer system. *See* Securities Exchange Act Rel. No. 40760 (Dec. 8, 1998), 63 FR 70844 (Dec. 22, 1998) (Regulation of Exchanges and Alternative Trading Systems, hereinafter "Regulation ATS Adopting Release"), at 70852.

[14] See 15 U.S.C. §§ 78e-78f. A "national securities exchange" is an exchange registered as such under Section 6 of the Exchange Act.

[15] 15 Rule 300(a) of Regulation ATS provides that an ATS is "any organization, association, person, group of persons, or system: (1) [t]hat constitutes, maintains, or provides a marketplace or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange within the meaning of [Exchange Act Rule 3b-16]; and (2) [t]hat does not: (i) [s]et rules governing the conduct of subscribers other than the conduct of subscribers' trading on such [ATS]; or (ii) [d]iscipline subscribers other than by exclusion from trading."

[16] *See* 17 CFR 240.3a1-1(a)(2). Rule 3a1-1 also provides exemptions from the definition of "exchange" for any ATS operated by a national securities association, and any ATS not required to comply with Regulation ATS pursuant to Rule 301(a) of Regulation ATS. See 17 CFR 240.3a1-1(a)(1) and (3).

27

---

67.     Regulation ATS requires an ATS to, among other things, register as a broker-dealer, file a Form ATS with the Commission to notice its operations, and establish written safeguards and procedures to protect subscribers' confidential trading information. An ATS that complies with Regulation ATS and operates pursuant to the Rule 3a1-1(a)(2) exemption is not required by Section 5 to register as a national securities exchange.

68.     The Coinbase Exchanges are exchanges under these regulations. They perform the functions of a traditional exchange by bringing together buy orders and sell orders and use established and nondiscretionary methods to set the prices at which these orders are executed.

69.     Coinbase is also obligated to register as a broker-dealer. Section 15 of the Exchange Act requires that any person operating as a broker in U.S. securities markets must register with the SEC and obtain membership with, and be regulated by, the Financial Industry Regulatory Authority, or "FINRA," or operate subject to an exemption from registration[17].

70.     The Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others[18]."

---

[17] 15 U.S.C. § 78o(a)(1), (a)(8).
[18] 15 U.S.C. § 78c(a)(4).

28

---

COMPLAINT FOR DAMAGES                         Case No:

Brokerage activity is typically evidenced by persons acting as agents on behalf of others in "key points in the chain of [securities] <u>distribution</u>[19]."

71.    Brokers typically operate "in the business" of assisting issuers seeking to conduct securities offerings and/or investors seeking to buy or sell securities during either an initial offering or on the secondary market—frequently in exchange for transaction-based <u>compensation</u>[20].

72.    The Exchange Act defines "dealer" to include an entity that is "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular <u>business</u>.[21]

73.    Coinbase effects transactions in the Tokens for the accounts of its customers; it is thus obligated to register with the SEC as a broker-dealer but has failed to do so.

## II.    COINBASE LISTS AND SELLS SECURITIES BUT IS NOT REGISTERED AS A SECURITIES EXCHANGE

### A.    DIGITAL ASSETS LISTED ON COINBASE ARE SECURITIES

---

[19] *See, e.g., Mass. Fin. Servs., Inc. v. Sec. Inv't Prot. Corp.*, 411 F. Sup. 411, 415 (D. Mass.) *aff'd*.545 F.2d 754 (1st Cir. 1976), *cert. denied*, 431 U.S. 904 (1977); *SEC v. Nat'l Exec. Planners, Ltd.*,503 F. Supp. 1066, 1073 (M.D.N.C. 1980).
[20] *See, e.g., SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003); *SEC v. Margolin*, No. 92 CIV. 6307 (PKL), 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992).
[21] 15 U.S.C. § 78c(a)(5).

---

Coinbase has listed the Tokens on its Digital Asset Platforms. Analysis of the facts and circumstances surrounding the Tokens shows that they are investment contracts under *SEC v.W.J. Howey Co.*, 328 U.S. 293 (1946), and are therefore securities.

### 1. 1INCH

73. 1Inch ("1INCH") is a token created by the 1Inch Foundation. The first *bona fide* public offering of 1Inch occurred on or about December 24, 2020.

### 2. *AAVE*

74. *Aave ("AAVE") is a token created by Aave. The first bona fide public offering of AAVE occurred on or about October 2, 2020.*

### 3. ACH

75. Alchemy Pay ("ACH") is a token created by Alchemy Pay. The first *bona fide* public offering of ACH occurred on or about September 7, 2020.

### 4. *ADA*

76. *Cardano ("ADA") is a token that was first bona fide offered to the public in or about September 2017.*

### 5. AGLD

COMPLAINT FOR DAMAGES                              Case No:

77.     Adventure Gold ("AGLD") is a token created by Loot. The first *bona fide* public offering of Adventure Gold occurred on or about September 2, 2021.

### 6.     ALGO

78.     Algorand ("ALGO") is a token created, developed, issued, and distributed by Algorand, Inc. and the Algorand Foundation (together the "Algorand Entities"). ALGO was first *bona fide* offered to the public in the United States in or about June 2019.

### 7.     AMP

79.     Amp ("AMP") is a token that was first *bona fide* offered to investors on or about September 8, 2020. AMP became available for trading on the Coinbase Exchanges on or about June 10, 2021. Since then, AMP has continuously been traded on the Coinbase Exchanges.

### 8.     ANKR

80.     Ankr ("ANKR") is a token created by Ankr. The first *bona fide* public offering of ANKR occurred on or about August 31, 2018.

### 9.     ARPA

81.     ARPA Chain ("ARPA") is a token created by Arpachain. The first *bona fide* public offering of ARPA occurred on or about April 25, 2019.

COMPLAINT FOR DAMAGES                                    Case No:

### 10.  ATOM

82.    Cosmos ("ATOM") is a token created, issued, and distributed by the developers of the Cosmos network. The first *bona fide* public offering of ATOM occurred in or about April 2017.

### 11.  AUCTION

83.    Bounce Token ("AUCTION") is a token created by Bounce. The first *bona fide* public offering of AUCTION occurred on or about January 14, 2021.

### 12.  AXS

84.    Axie Infinity Shards ("AXS") is a token created, issued, and distributed by Sky Mavis. AXS was first *bona fide* offered to the public on or about November 4, 2020 and became available for trading on the Coinbase Platform on or about August 13, 2021.

### 13.  BAL

85.    Balancer ("BAL") is a token created by Balancer Labs. The first *bona fide* public offering of BAL occurred on or about June 1, 2020.

### 14.  BAND

32

86.     Band Protocol ("BAND") is a token created by the developer of the Band Protocol. The first *bona fide* public offering of BAND occurred on or about September 17, 2019.

### 15.    BAT

87.     Basic Attention Token ("BAT") is a token created by Brave Software. The first *bona fide* public offering of BAT occurred on or about May 31, 2017.

### 16.    BNT

88.     Bancor Network Token ("BNT") is a token created by Bancor. The first *bona fide* public offering of BNT occurred on or about June 11, 2017.

### 17.    BOND

89.     BarnBridge ("BOND") is a token created by BarnBridge. The first *bona fide* public offering of BOND occurred on or about October 26, 2020.

### 18.    BTRST

90.     Braintrust ("BTRST") is a token created by Braintrust. The first *bona fide* public offering of BTRST occurred on or about September 15, 2021.

### 19.    CGLD

91.    Celo ("CGLD") is a token created by Celo. The first *bona fide* public offering of CGLD occurred on or about May 11, 2020.

### 20.    CLV

92.    Clover Finance ("CLV") is a token created by Clover Inc. The first *bona fide* public offering of CLV occurred on or about April 20, 2021.

### 21.    COMP

93.    Compound ("COMP") is a token created, issued, and distributed by Compound Labs. It was first *bona fide* offered to the public on or about June 15, 2020. COMP became available for trading on the Coinbase Pro Platform on or about June 23, 2020. COMP became available for trading on the Coinbase Platform on or about June 25, 2020.

### 22.    CRO

94.    Crypto.com Coin ("CRO") is a token created, developed, issued, and distributed by CRO Protocol Labs, also known as Crypto.com ("Crypto.com"). CRO was first *bona fide* offered to the public in or around November 2018. CRO became available for trading on the Coinbase Pro Platform on or about November 2, 2021. CRO became available for trading on the Coinbase Platform on or about November 3, 2021.

COMPLAINT FOR DAMAGES                         Case No:

### 23. CRV

95. Curve DAO Token ("CRV") is a token created by Curve. The first *bona fide* public offering of CRV occurred on or about August 15, 2020.

### 24. CTSI

96. Cartesi ("CTSI") is a token created by Cartesi. The first *bona fide* public offering of CTSI occurred on or about April 21, 2020.

### 25. CVC

97. Civic ("CVC") is a token created by Civic Technologies, Inc. ("Civic Technologies"). The first *bona fide* public offering of CVC occurred on or about June 20, 2017.

### 26. DNT

98. district0x ("DNT") is a token created by district0x. The first *bona fide* public offering of DNT occurred on or about August 1, 2017.

### 27. DOGE

99. Dogecoin ("DOGE") is a token that was first *bona fide* offered to the public in or about December 2013.

### 28. DOT

35

100.    Polkadot ("DOT") is a token created by Gavin Wood (a co-founder of Ethereum) alongside co-founders Robert Habermeier and Peter Czaban in 2016. DOT's main blockchain, the relay chain, became live on or about May 26, 2020. The first *bona fide* public offering of DOT occurred on or about July 27, 2020. DOT became available for trading on the Coinbase Exchanges on or about June 16, 2021.

### 29.    ENJ

101.    Enjin Coin ("ENJ") is a token created by Enjin. The first *bona fide* public offering of ENJ occurred on or about November 1, 2017.

### 30.    EOS

102.    EOS coin ("EOS") is a token created, issued, and distributed by Block.one. EOS was first *bona fide* offered to investors in or around June 2017. EOS became available for trading on the Coinbase Pro Platform on or about April 8, 2019. EOS became available for trading on the Coinbase Platform on or about May 30, 2019. Since becoming available on the Coinbase Platform, EOS has continuously been traded on the Coinbase Exchanges.

### 31.    FARM

COMPLAINT FOR DAMAGES                                    Case No:

103.    Harvest Finance ("FARM") is a token created by Harvest Finance. The first *bona fide* public offering of FARM occurred on or about September 1, 2020.

### 32.    FET

104.    Fetch.ai ("FET") is a token created by Fetch.ai. *The first bona fide public offering of FET occurred on or about February 25, 2019.*

### 33.    FIL

105.    Filecoin ("FIL") is a token created by Protocol Labs. The project was launched in August 2017.

### 34.    FORTH

106.    Ampleforth ("FORTH") is a token created by Ampleforth. The first *bona fide* public offering of FORTH occurred on or about April 13, 2019.

### 35.    GNT

107.    Golem ("GNT") is a token created by Golem Network. *The first bona fide public offering of GNT occurred on or about November 11, 2016.*

### 36.    GRT

108.   The Graph ("GRT") is a token created, issued, and distributed by the Graph Foundation. GRT was first *bona fide* offered to the public on or about October 23, 2020.

### 37.   GTC

109.   Gitcoin ("GTC") is a token created by Gitcoin.co. The first *bona fide* public offering of GTC occurred on or about May 1, 2021.

### 38.   ICP

110.   Internet Computer ("ICP") is a token created, developed, issued, and distributed by Dfinity Foundation ("Dfinity"), a Swiss nonprofit organization. ICP was first *bona fide* offered to investors on or about May 10, 2021.

### 39.   IOTX

111.   IoTeX ("IOTX") is a token created by IoTeX. The first *bona fide* public offering of IOTX occurred on or about May 23, 2018.

### 40.   KEEP

112.   Keep Network ("KEEP") is a token created by Keep SEZC. The first *bona fide* public offering of KEEP occurred on or about April 27, 2020.

### 41.   KNC

38

113.   Kyber Network ("KNC") is a token created by the developers of the Kyber Network. The first bona fide public offering of KNC occurred on or about September 15, 2017.

### 42.   LINK

114.   Chainlink ("LINK") is a token created, developed, issued, and distributed by Chainlink Labs. LINK was first *bona fide* offered to the public in or about September 2017. LINK became available for trading on the Coinbase Pro Platform on or about June 26, 2019. LINK became available for trading on the Coinbase Platform on or about June 28, 2019.

### 43.   LOOM

115.   Loom ("LOOM") is a token created by Loom Network. The first *bona fide* public offering of LOOM occurred on or about January 10, 2018.

### 44.   LRC

116.   Loopring ("LRC") is a token created by Loopring. The first *bona fide* public offering of LRC occurred on or about August 1, 2017.

### 45.   MANA

117.   Decentraland ("MANA") is a token created, issued, and distributed by the Decentraland Foundation. MANA was first *bona fide* offered to the public in or

39

about August 2017. MANA became available for trading on the Coinbase Pro Platform on or about December 10, 2018. MANA became available for trading on the Coinbase Platform on or about November 5, 2020.

### 46.   MATIC

118.    Polygon ("MATIC") is a token that was first *bona fide* offered to investors as the native token of the MATIC network in or about October 2017. MATIC was rebranded as Polygon on February 9, 2021.

### 47.   MKR

119.    Maker ("MKR") is a token created by MakerDAO. The first *bona fide* public offering of MKR occurred on or about January 30, 2017.

### 48.   MLN

120.    Enzyme ("MLN") is a token created by Enzyme. The first *bona fide* public offering of MLN occurred on or about February 15, 2017.

### 49.   NKN

121.    NKN coin ("NKN") is a token created by New Kind of Network. The first *bona fide* public offering of NKN occurred on or about April 19, 2018.

### 50.   NMR

122.   Numeraire ("NMR") is a token created by Numerai. The first *bona fide* public offering of Numeraire occurred on or about June 20, 2017.

### 51.   NU

123.   NuCypher ("NU") is a token created by NuCypher. The first *bona fide* public offering of NU occurred on or about September 30, 2020.

### 52.   OGN

124.   Origin ("OGN") is a token created by the developers of the Origin Protocol. The first *bona fide* public offering of OGN occurred on or about January 8, 2020.

### 53.   OMG

125.   OMG Network ("OMG") is a token created by the OMG Foundation. The first *bona fide* public offering of OMG occurred on or about June 23, 2017.

### 54.   ORN

126.   Orion Protocol ("ORN") is a token created by Orion Protocol Ltd. The first *bona fide* public offering of ORN occurred on or about July 14, 2020.

### 55.   OXT

COMPLAINT FOR DAMAGES                    Case No:

127.   Orchid ("OXT") is a token created by Orchid. The first *bona fide* public offering of OXT occurred on or about May 7, 2019.

### 56.   PLA

128.   PlayDapp ("PLA") is a token created by PlayDapp. The first *bona fide* public offering of PLA occurred on or about October 19, 2020.

### 57.   POLY

129.   Polymath ("POLY") is a token created by Polymath. The first *bona fide* public offering of POLY occurred on or about January 12, 2018.

### 58.   QNT

130.   Quant ("QNT") is a token created, issued, and distributed by the Quant Network. was first *bona fide* offered to the public in or about May 11, 2018.

### 59.   QUICK

131.   QuickSwap ("QUICK") is a token created by QuickSwap. The first *bona fide* public offering of QUICK occurred on or about February 23, 2021.

### 60.   RARI

132.   Rarible ("RARI") is a token created, issued, and distributed by Rarible Inc. Was first *bona fide* offered to the public on or about July 15, 2020.

COMPLAINT FOR DAMAGES                    Case No:

**61.    REN**

133.    Ren ("REN") is a token created by Ren. The first *bona fide* public offering of REN occurred on or about February 3, 2018.

**62.    REP**

134.    Augur ("REP") is a token created by the Forecast Foundation. The first *bona fide* public offering of REP occurred on or about August 14, 2015.

**63.    RLC**

135.    iExec RLC ("RLC") is a token created by iExec. The first bona fide public offering of RLC occurred on or about April 19, 2017.

**64.    SHIB**

136.    Shiba Inu ("SHIB") is a token that was first *bona fide* offered to investors on or about August 1, 2020. SHIB became available for trading on the Coinbase Pro Platform on or about September 9, 2021. SHIB became available for trading on the Coinbase Platform on or about September 16, 2021. Since becoming available on the Coinbase Platform, SHIB has continuously been traded on the Coinbase Exchanges.

**65.    SKL**

43

137.     Skale ("SKL") is a token created by SKALE Network. The first *bona fide* public offering of SKL occurred on or about September 3, 2020.

**66.     SNX**

138.     Synthetix ("SNX") is a token created by Synthetix. The first *bona fide* public offering of SNX occurred on or about February 28, 2018.

**67.     SOL**

139.     Solana ("SOL") is a token created, developed, issued, and distributed by Solana Labs, Inc. ("Solana Labs") and the Solana Foundation (together with Solana Labs, the "Solana Entities"). SOL was first *bona fide* offered to the public in the United States in or about April 2020.

**68.     STORJ**

140.     Storj ("STORJ") is a token created by Storj Labs, Inc. The first *bona fide* public offering of STORJ occurred on or about May 24, 2017.

**69.     SUSHI**

141.     SushiSwap ("SUSHI") is a token created by Sushi. The first *bona fide* public offering of SushiSwap occurred on or about August 27, 2020.

**70.     TRB**

142.     Tellor ("TRB") is a token created by Tellor. The first *bona fide* public offering of TRB occurred on or about November 18, 2019.

### 71.     TRIBE

143.     Tribe ("TRIBE") is a token created by Fei Labs. The first *bona fide* public offering of TRIBE occurred on or about April 2, 2021.

### 72.     UMA

144.     UMA token ("UMA") is a token created by UMA. The first *bona fide* public offering of UMA occurred on or about April 29, 2020.

### 73.     UNI

145.     Uniswap ("UNI") is a token created, developed, issued, and distributed by Uniswap Labs. was first *bona fide* offered to the public in the United States in or about September 2020.

### 74.     XLM

146.     Stellar Lumen ("XLM") is a token created, issued, and distributed by the Stellar Development Foundation ("SDF"). was first *bona fide* offered to the public in or about July 2014. XLM became available for trading on the Coinbase Pro Platform on or about March 13, 2019. XLM became available for trading on the Coinbase Platform on or about March 18, 2019.

**75.   XRP**

147.   Ripple ("XRP") is a token created, issued, and distributed by Ripple Labs Inc. ("Ripple"). Coinbase describes XRP as follows: "XRP is the cryptocurrency used by the Ripple payment network. Built for enterprise use, XRP aims to be a fast, cost-efficient cryptocurrency for cross-border payments." XRP was first *bona fide* offered to investors in 2013. It became available for trading on the Coinbase Exchanges on or about February 28, 2019.

**76.   XTZ**

148.   Tezos ("XTZ") is a token created, issued, and distributed by the Tezos Foundation. XTZ was first *bona fide* offered to the public in or about July 2017. became available for trading on the Coinbase Pro Platform on or about August 5, 2019.

**77.   XYO**

149.   XYO coin ("XYO") is a token created by XYO Network. The first *bona fide* public offering of XYO occurred on or about May 21, 2018.

**78.   YFI**

150.   yearn.finance ("YFI") is a token created, issued, and distributed by Yearn Finance. YFI was first *bona fide* offered to the public on or about December

30, 2020. YFI became available for trading on the Coinbase Pro Platform on or about September 15, 2020.

### 79.   ZRX

151.   0x ("ZRX") is a token created by 0x. The first *bona fide* public offering of ZRX occurred on or about August 15, 2017.

### 80.   GYEN

152.   GYEN ("GYEN") is a token. The first *bona fide* public offering occurred on or about March 2021. GYEN became available for trading on Coinbase Platform on or about November 2021.

153.   Plaintiff's own statements show that he was motivated to buy the Tokens previously described primarily by the expectation of profit, not by any direct utility of those tokens may have now or in the future.

154.   Based on the facts alleged above, among others, all the Tokens described above qualify as an investment contract and thus a security.

155.   The teams behind every Token actively conceal that each and all Tokens are a security. For example, the Woof Paper purports to inform investors that by purchasing the Tokens, they "agree that [they] are not purchasing a security or investment."

47

156.    The Coinbase Exchanges provide users with hyperlinks to the Tokens' official website and the Woof Paper. Coinbase thus participates in the attempt to simultaneously (1) persuade investors that by buying the Tokens, they will profit from the efforts of others and (2) conceal the Tokens' status as a security.

157.    During the Material Period, Plaintiff, have had one or more losing transactions in many of those tokens on and with Coinbase. Plaintiff bought several of the Tokens on the Coinbase Exchanges that he subsequently sold on one or more occasions at a loss. Plaintiff have paid fees to Coinbase as part of his transactions in many of those tokens.

**B.    COINBASE OFFERS, TRADES AND SELLS UNREGISTERED SECURITIES.**

158.    Because the Tokens are unregistered securities and because Coinbase offers the Tokens for sale on the Coinbase Exchanges, Coinbase has sold unregistered securities to Plaintiff.

159.    The structure of Coinbase means that it is the counterparty in every transaction in a Token on the Coinbase Exchanges. Customers only exchange funds and crypto assets with Coinbase itself, and never with other users. All transactions in the Tokens made on Coinbase are reflected only in Coinbase's internal records, and Coinbase itself receives all funds and provides all Tokens

48

purchased. Coinbase is thus in privity with each Coinbase customer in each of their transactions and is the seller whenever a customer buys a token on Coinbase.

160.    Moreover, Coinbase solicits the Tokens for sale in order to earn trading fees. Coinbase promotes the sale of Tokens by providing users with descriptions of each Token and its purported value proposition. Coinbase also participated in direct promotions, including "airdrops" of free Tokens designed to increase trading volume. Coinbase also writes news updates on price movements of the Tokens, and links to stories about the Tokens published across the internet. These solicitations profit Coinbase by increasing the number of transactions on the Coinbase Exchanges and thus the fees paid to Coinbase; these solicitations are thus motivated at least in part by a desire to serve their own financial interests.

**C.    THE COINBASE EXCHANGES ARE RULE 3b-16(a) SYSTEMS AND THEREFORE ARE UNREGISTERED "EXCHANGES" UNDER THE EXCHANGE ACT**

161.    The Coinbase Exchanges satisfy the criteria of Exchange Act Rule 3b-16(a) and are not exempted under Rule 3b-16(b). As described above, the Coinbase Platform and the Coinbase Pro Platform each bring together orders of multiple buyers and sellers. The Coinbase Platform and the Coinbase Pro Platform each receive, and store digital asset buy and sell orders for Tokens from their users. The Coinbase Platform and the Coinbase Pro Platform each provided the means for these orders to interact and execute through the combined use of the Coinbase and

COMPLAINT FOR DAMAGES                    Case No:

Coinbase Pro websites, mobile apps, order books, and pre-programmed trading rules protocols defined in the Coinbase and Coinbase Pro trading engine. These established non-discretionary methods allowed Coinbase and Coinbase Pro users to agree upon the terms of their trades in Tokens on Coinbase and Coinbase Pro during the Material Period.

162.    Coinbase is thus an "organization ... which ... maintains [and] provides a marketplace or facilities for bringing together purchasers and sellers" of digital assets. *See* 15 U.S.C. § 78c. As discussed in further detail below, because many of the digital assets listed on the Coinbase Exchanges are securities, the Coinbase Platform and the Coinbase Pro Platform each meet the statutory definition of an exchange under the Exchange Act. *Id.*

**D.    COINBASE OPERATES AS AN UNREGISTERED BROKER-DEALER ON THE COINBASE EXCHANGES**

163.    Coinbase's activities further meet the definition of both a "broker-dealer" under the Exchange Act. The Exchange Act defines "broker" in part as an entity that is "engaged in the business of effecting transactions in securities for the account of others." *Id.* § 78c(a)(4)(A). In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering.

COMPLAINT FOR DAMAGES                                          Case No:

164.    For example, during the Material Period, Coinbase operated as a broker by effecting transactions in Tokens for users of the Coinbase Exchanges by matching buy and sell orders using the Coinbase matching engine as described above. Coinbase also operated as a broker-dealer by facilitating the sale of Tokens as part of ICOs. For example, on February 28, 2019 Coinbase announced that the Token XRP was available for trading on the Coinbase Platform. As discussed, above, the SEC has charged Ripple Labs Inc., the founder, developer, and issuer of XRP with operating one long continuous ICO from 2013 to the present, which includes the period of time during which Coinbase facilitated the sale of XRP by listing it for trading and facilitating transactions for XRP.

165.    Coinbase's activities also meet the Exchange Act's definition of "dealer", which includes entities that are "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business." 15 U.S.C. § 78c(a)(5)A). During the Material Period, Coinbase operated as a dealer as defined by the Exchange Act by, *inter alia,* (1) holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for Tokens; (2) maintaining custody over Coinbase Exchange customers' Tokens; (3) by providing customers services such as allowing purchase of Tokens on credit; (4) by having a regular turnover inventory of Tokens; (5) by purchasing Tokens for accounts in Coinbase's

COMPLAINT FOR DAMAGES                          Case No:

name (often at a discount to the ICO price); and (6) selling the digital assets to investors for profit immediately or at a later time after being held in inventory.

**III.**              **CLAIMS FOR RELIEF**

**IV.**              **FIRST CAUSE OF ACTION**

**Offer and Sale of Unregistered Securities**
**Sections 5 and 12(a)(1) of the Securities Act**
**(By Plaintiff Against Coinbase Global and Coinbase, Inc.)**

166.    Plaintiff realleges and incorporates the allegations above.

167.    Plaintiffs brings this Cause of Action as to each Token that was first *bona fide* offered to the public within three years of the September 28, 2021 filing of the Complaint (each a "12(a)(1) Token"). The 12(a)(1) Tokens are: 1INCH, AAVE, ACH, AGLD, ALGO, AMP, ARPA, AUCTION, AXS, BAL, BAND, BOND, BTRST, CGLD, CLV, COMP, CRO, CRV, CTSI, DOT, FARM, FET, FORTH, GRT, GTC, ICP, KEEP, NU, OGN, ORN, OXT, PLA, QUICK, RARI, SHIB, SKL, SOL, SUSHI, TRB, TRIBE, UMA, UNI,YFI and GYEN.

168.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be

COMPLAINT FOR DAMAGES                              Case No:

carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

169.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

170.    All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. *Id.* § 77b(a)(1). No registration statements have been filed with the SEC or have been in effect with respect to any of the Tokens listed on the Coinbase Exchanges.

171.    Throughout the Material Period, Coinbase Global and Coinbase, Inc. promoted, solicited, offered, and sold 12(a)(1) Tokens to Plaintiff. Because of the structure of the Coinbase Exchanges, Coinbase Global and Coinbase, Inc. are in privity in every sale of a 12(a)(1) Token, including those by Plaintiff. Customers

on Coinbase transact solely with Coinbase itself, and Coinbase is thus a seller of the Tokens.

172.    In addition, by offering 12(a)(1) Tokens to Plaintiff, Coinbase Global and Coinbase, Inc. solicited these purchases, and in doing so were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of 12(a)(1) Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of 12(a)(1) Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of 12(a)(1) Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for 12(a)(1) Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

173.    Coinbase Global and Coinbase, Inc. thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell unregistered securities, or to carry or cause such unregistered securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

174.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title … shall be liable … to the person purchasing such security from him, who may sue either

at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

175.    Accordingly, Defendants Coinbase Global and Coinbase, Inc. have violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), 77*l*(a)(1).

176.    Plaintiff purchased 12(a)(1) Tokens on the Coinbase Exchanges and subsequently sold those 12(a)(1) Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any 12(a)(1) Tokens purchased in the Material Period was subsequently sold at a loss. *See id.* § 77*l*(a)(1).

# V.                    <u>SECOND CAUSE OF ACTION</u>

### Control Person Liability for Violations of the Securities Act
### Section 15 of the Securities Act
### (By Plaintiff Against Coinbase Global and Brian Armstrong)

177.    Plaintiff realleges and incorporates the allegations above.

178.    This Count is asserted against Coinbase Global and Brian Armstrong for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

179.    Section 15 of the Securities Act provides: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in

connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." *Id.* § 77o(a).

180.   At the time of the wrongs alleged herein, Coinbase Global controlled Coinbase, Inc. Coinbase Global, by virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, had the power and authority to direct the management and activities of Coinbase, Inc. and its employees, and to cause Coinbase, Inc. to engage in the wrongful conduct complained of herein. Coinbase Global, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase, Inc.

181.   Coinbase Global purposefully exercised its power and influence to cause Coinbase, Inc. to violate the Securities Act as described herein, including by promoting, soliciting, offering, and selling unregistered securities to Plaintiff in violation of sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a),

COMPLAINT FOR DAMAGES                                   Case No:

77e(c), 77*l*(a)(1). Coinbase, Inc. is liable under section 12(a)(1) of the Securities Act, *id.* § 77*l*(a)(1), for its violations of the Securities Act.

182.   At the time of the wrongs alleged herein, Coinbase Global had sufficient influence to cause Coinbase, Inc. to refrain from promoting, soliciting, offering, and selling unregistered securities in violation of the Securities Act. Coinbase Global purposefully decided not to do so.

183.   Coinbase Global knowingly and culpably participated in, and/or aided and abetted, Coinbase, Inc.'s violations of the Securities Act alleged herein. Coinbase Global had knowledge of or reasonable ground to believe in the existence of the facts alleged herein, which form the basis for Coinbase, Inc.'s liability under section 12(a)(1) of the Securities Act.

184.   Accordingly, Coinbase Global is jointly and severally liable for the violations of the Securities Act by Coinbase, Inc. complained of herein and is liable to Plaintiff as to each transaction in which any 12(a)(1) Token purchased in the Material Period was subsequently sold at a loss. *See id.* § 77*l*(a)(1).

185.   With respect to Coinbase Global, the instant claim is pleaded in the alternative to the extent that Coinbase Global is found not to be directly liable under the First Cause of Action.

186. As CEO and founder of both Coinbase Global and Coinbase Inc., Brian Armstrong had the power and authority to direct the management and activities of Coinbase and its employees, and to cause Coinbase to engage in the wrongful conduct complained of herein. Armstrong, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase.

187. Armstrong purposefully exercised its power and influence to cause Coinbase to violate the Securities Act as described herein, including by directing Coinbase not to register as an exchange or broker-dealer prior to offering and selling securities to Plaintiff in violation of sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), 77*l*(a)(1). Coinbase is liable under section 12(a)(1) of the Securities Act, *id.* § 77*l*(a)(1), for its violations of the Securities Act.

188. At the time of the wrongs alleged herein, Armstrong had sufficient influence to cause Coinbase to refrain from promoting, soliciting, offering, and selling unregistered securities in violation of the Securities Act. Armstrong purposefully decided not to do so.

189. Armstrong knowingly and culpably participated in, and/or aided and abetted, Coinbase's violations of the Securities Act alleged herein. Armstrong had knowledge of or reasonable ground to believe in the existence of the facts alleged

58

herein, which form the basis for Coinbase's liability under Section 12(a)(1) of the Securities Act.

190.   Accordingly, Armstrong is jointly and severally liable for the violations of the Securities Act by Coinbase complained of herein and is liable to Plaintiff for damages, inclusive of transaction fees, as to each transaction in which any 12(a)(1) Token purchased in the Material Period was subsequently sold at a loss. *See id.* § 77*l*(a)(1).

## VI.          <u>THIRD CAUSE OF ACTION</u>

**Illegal Contracts to Pay Transaction Fees to an Unregistered Exchange
Sections 5 and 29(b) of the Exchange Act
(By Plaintiff Against Coinbase Global and Coinbase, Inc.)**

191.   Plaintiff reallege and incorporates the allegations above.

192.   In relevant part, section 5 of the Exchange Act makes it unlawful "for any …exchange, directly or indirectly, to make use of … any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security … unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration." 15 U.S.C. § 78e. An "exchange" is any entity that "constitute[s], maintain[s], or provide[s] 'a marketplace or facilities for bringing together

purchasers and sellers of securities.' "17 C.F.R. § 240.3b-16 (quoting 15 U.S.C. § 78c).

193.    Throughout the Material Period, Coinbase has made use of means and instrumentalities of interstate commerce for the purpose of using facilities of an exchange within and subject to the jurisdiction of the United States to effect transactions in Tokens. Coinbase has operated the Coinbase Exchanges throughout the Material Period through the utilization of the Internet within, and multiple servers throughout, the United States.

194.    The Coinbase Exchanges are exchanges because they provide a marketplace and facilities for bringing together purchasers and sellers of Tokens. *Id.* All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1).

195.    Coinbase and the Coinbase Exchanges have never been registered as national securities exchange under 15 U.S.C. § 78f, nor are they exempt from such registration. *See id.* §78e.

196.    Coinbase has thus operated unregistered exchanges in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e, throughout the Material Period.

COMPLAINT FOR DAMAGES                              Case No:

197.    Each transaction in a Token on the Coinbase Exchanges constitutes a contract between Coinbase and Plaintiff. Pursuant to these contracts, Plaintiff paid Coinbase transaction fees to fulfill purchase orders for Tokens.

198.    The foregoing contracts were made in violation of section 5 of the Exchange Act. The performance of these contracts necessarily involves the violation of section 5 because, pursuant to each such contract, Coinbase was required to continue its practice of operating unregistered exchanges that bring together purchasers and sellers of Tokens.

199.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter …shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of any such contract." 15 U.S.C. § 78cc(b).

200.    Section 29(b) affords Plaintiff the right, which he hereby pursues, to void and rescind the contracts pursuant to which they paid Coinbase fees for fulfillment of purchase orders for Tokens and to recover, as a rescissory remedy, the fees they have paid under those contracts.

## VII.             FOURTH CAUSE OF ACTION

**Illegal Contracts to Pay Transaction Fees to an Unregistered Broker or Dealer
Sections 15(a)(1) and 29(b) of the Exchange Act
(By Plaintiff Against Coinbase Global and Coinbase, Inc.)**

201.    Plaintiff realleges and incorporates the allegations above.

202.    Section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer… to make use of … any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

203.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id.* § 78c(a)(4)(A).

204.    Coinbase has operated as a broker during the Material Period by facilitating the sale of Tokens in exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors after payment. All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. *Id.* § 77b(a)(1).

205.    A "dealer" includes an entity "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business." *Id.* § 78c(a)(5).

206.    Coinbase has operated as a dealer during the Material Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' Tokens, by providing customers with access to services allowing purchase of Tokens on credit, by having a regular turnover inventory of securities, by purchasing Tokens for accounts in Coinbase's own name (often at a discount to the ICO price), and by selling Tokens from its inventory to investors for profit.

207.    Throughout the Material Period, Coinbase has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, Tokens.

208.    Coinbase has never registered as a broker or dealer in accordance with section 15(b) of the Exchange Act.

209.    Coinbase has thus operated as an unregistered broker-dealer in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

COMPLAINT FOR DAMAGES                              Case No:

210.    In the course of operating as an unregistered broker-dealer, Coinbase has entered into contracts with Plaintiff pursuant to which Plaintiff paid Coinbase transaction fees to fulfill purchase orders for Tokens.

211.    The foregoing contracts were made in violation of section 15(a)(1) of the Exchange Act. The performance of these contracts necessarily involves the violation of section 15(a)(1) because, pursuant to each such contract, Coinbase was required to continue its practice of operating as a broker, dealer, or both, despite not being registered as a broker or dealer.

212.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter … shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of any such contract." 15 U.S.C. § 78cc(b).

213.    Section 29(b) affords Plaintiff the right, which hereby he pursues, to void and rescind the contracts pursuant to which he paid Coinbase fees for fulfillment of purchase orders for Tokens and to recover, as a rescissory remedy, the fees they have paid under those contracts.

64

## VIII.                    FIFTH CAUSE OF ACTION

**Illegal Contracts to Purchase Securities from an Unregistered Exchange
Sections 5 and 29(b) of the Exchange Act
(By Plaintiff Against Coinbase Global and Coinbase, Inc.)**

214.    Plaintiff realleges and incorporates the allegations above.

215.    In relevant part, section 5 of the Exchange Act makes it unlawful "for any … exchange, directly or indirectly, to make use of … any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security … unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration." 15 U.S.C. § 78e. An "exchange" is any entity that "constitute[s], maintain[s], or provide[s] 'a marketplace or facilities for bringing together purchasers and sellers of securities.' "17 C.F.R. § 240.3b-16 (quoting 15 U.S.C. § 78c).

216.    Throughout the Material Period, Coinbase has made use of means and instrumentalities of interstate commerce for the purpose of using facilities of an exchange within and subject to the jurisdiction of the United States to effect transactions in Tokens. Coinbase has operated the Coinbase Exchanges throughout the Material Period through the utilization of the Internet within, and multiple servers throughout, the United States.

COMPLAINT FOR DAMAGES                              Case No:

217.   The Coinbase Exchanges are exchanges because they provide a marketplace and facilities for bringing together purchasers and sellers of Tokens. *Id.* All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1).

218.   Coinbase and the Coinbase Exchanges have never been registered as a national securities exchange under 15 U.S.C. § 78f, nor are they exempt from such registration. *See id.* § 78e.

219.   Coinbase has thus operated unregistered exchanges in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e, throughout the Material Period.

220.   Each transaction in a Token on the Coinbase Exchanges constitutes a contract between Coinbase and Plaintiff. Coinbase induced Plaintiff to enter these contracts for the purchase of Tokens during the Material Period. Coinbase did so by promoting, soliciting, offering, and selling Tokens to Plaintiff. In seeking to induce Plaintiffs to purchase Tokens, Coinbase Global and Coinbase, Inc. were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market

66

for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

221.    The contracts that Coinbase induced Plaintiff to enter for the purchase of Tokens were made in violation of section 5 of the Exchange Act, 15 U.S.C. § 78e. The performance of these contracts necessarily involves the violation of section 5 because each such contract could not be performed unless Coinbase continued its practice of operating an unregistered exchange that brings together purchasers and sellers of Tokens.

222.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter … shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of any such contract." *Id.* § 78cc(b).

223.    Section 29(b) affords Plaintiff the right, which hereby he pursues, to void and rescind each contract pursuant to which they purchased, on any Coinbase Exchange, any Token that they later sold at a loss. Plaintiff hereby offer to tender to Coinbase, Inc., the Tokens or substantial equivalent realized upon sale of all

Tokens he purchased on any Coinbase Exchange and later sold at a loss. In exchange for such tender, Plaintiffs and the Class are entitled to recover the amount of consideration he paid to purchase the tendered Tokens.

## IX.          SIXTH CAUSE OF ACTION

**Illegal Contracts to Purchase Securities from an Unregistered Broker or Dealer Sections 15(a)(1) and 29(b) of the Exchange Act (By Plaintiff Against Coinbase Global and Coinbase, Inc.)**

224.    Plaintiff realleges and incorporates the allegations above.

225.    Section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer … to make use of … any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

226.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id*. § 78c(a)(4)(A).

227.    Coinbase has operated as a broker during the Material Period by facilitating the sale of Tokens in exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors after

68

payment. All Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. *Id*. § 77b(a)(1).

228.   A "dealer" includes an entity "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business." *Id*. § 78c(a)(5).

229.   Coinbase has operated as a dealer during the Material Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' Tokens, by providing customers with access to services allowing purchase of Tokens on credit, by having a regular turnover inventory of securities, by purchasing Tokens for accounts in Coinbase's own name (often at a discount to the ICO price), and by selling Tokens from its inventory to investors for profit.

230.   Throughout the Material Period, Coinbase has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, Tokens.

231.   Coinbase has never registered as a broker or dealer in accordance with section 15(b) of the Exchange Act.

232.    Coinbase has thus operated as an unregistered broker-dealer in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

233.    Each transaction in a Token on the Coinbase Exchanges constitutes a contract between Coinbase and a Plaintiff. Coinbase induced Plaintiff to enter contracts for the purchase Tokens during the Material Period. Coinbase did so by promoting, soliciting, offering, and selling Tokens to Plaintiff. In seeking to induce Plaintiff to purchase Tokens, Coinbase Global and Coinbase, Inc. were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

234.    The contracts that Coinbase induced Plaintiff to enter for the purchase of Tokens were made in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. §78o(a)(1). The performance of these contracts necessarily involves the violation of section 15(a)(1) because each such contract could not be performed unless Coinbase continued its practice of operating as a broker, dealer, or both,

70

despite not being registered as a broker or dealer. Furthermore, Coinbase violated

section 15(a)(1) by inducing Plaintiff to enter these contracts—and thus engaging

in the business of effecting transactions in securities for the account of others, the

business of buying and selling securities for Coinbase's own account, or both—

without being registered as a broker or dealer.

235.   Section 29(b) of the Exchange Act provides in relevant part that

"[e]very contract made in violation of any provision of this chapter … and every

contract (including any contract for listing a security on an exchange) … the

performance of which involves the violations of, or the continuance of any

relationship or practice in violation of, any provision of this chapter … shall be

void … as regards the rights of any person who, in violation of any such provision,

… shall have made or engaged in the performance of such contract." 15 U.S.C. §

78cc.

236.   Section 29(b) affords Plaintiff the right, which he hereby pursues, to

void and rescind each contract pursuant to which they purchased, on any Coinbase

Exchange, any Token that they later sold at a loss. Plaintiff hereby offer to tender

to Coinbase, Inc, the Tokens or substantial equivalent realized upon sale of all

Tokens they purchased on any Coinbase Exchange and later sold at a loss. In

exchange for such tender, Plaintiff is entitled to recover the amount of

consideration he paid to purchase the tendered Tokens.

COMPLAINT FOR DAMAGES                    Case No:

X.                          **SEVENTH CAUSE OF ACTION**

**Control Person Liability for Violations of the Exchange Act**
**Section 20 of the Exchange Act**
**(By Plaintiff Against Coinbase Global and Brian Armstrong)**

237.    Plaintiff realleges and incorporates the allegations above.

238.    This Count is asserted against Coinbase Global and Brian Armstrong

for violations of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

239.    Section 20(a) of the Exchange Act provides: "Every person who,

directly or indirectly, controls any person liable under any provision of [the

Exchange Act] or of any rule or regulation thereunder shall also be liable jointly

and severally with and to the same extent as such controlled person to any person

to whom such controlled person is liable … unless the controlling person acted in

good faith and did not directly or indirectly induce the act or acts constituting the

violation or cause of action." 15 U.S.C. § 78t(a).

240.    At the time of the wrongs alleged herein, Coinbase Global controlled

Coinbase, Inc. Coinbase Global, by virtue of its stock ownership, agency,

agreements or understandings, specific acts, and otherwise, had the power and

authority to direct the management and activities of Coinbase, Inc. and its

employees, and to cause Coinbase, Inc. to engage in the wrongful conduct

complained of herein. Coinbase Global, at the time of the wrongs alleged herein,

COMPLAINT FOR DAMAGES                              Case No:

had the power to direct or cause the direction of the management and policies of Coinbase, Inc.

241.    Coinbase Global purposefully exercised its power and influence to cause Coinbase, Inc. to violate the Exchange Act as described herein, including by (1) operating unregistered exchanges and, in the course of operating such exchanges, entering unlawful contracts to sell Tokens and to receive transaction fees for sales of Tokens, in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e; and (2) operating as an unregistered broker-dealer, and, in the course of so operating, entering unlawful contracts to sell Tokens and to receive transaction fees for sales of Tokens, in violation of sections 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

242.    At the time of the wrongs alleged herein, Coinbase Global had sufficient influence to cause Coinbase, Inc. either to register as an exchange and broker-dealer or to refrain from acts that are prohibited by the Exchange Act for persons not registered as an exchange and broker dealer. Coinbase Global purposefully decided not to do so.

243.    Coinbase Global knowingly and culpably participated in, and/or aided and abetted, Coinbase, Inc.'s violations of the Exchange Act alleged herein.

COMPLAINT FOR DAMAGES                                      Case No:

244.     Accordingly, Coinbase Global is jointly and severally liable for the violations of the Exchange Act by Coinbase, Inc. complained of herein and is liable to Plaintiff for rescission and/or damages as to all transactions in which Plaintiff purchased, on any Coinbase Exchange, any Token that they later sold at a loss.

245.     With respect to Coinbase Global, the instant claim is pleaded in the alternative to the extent that Coinbase Global is found not to be directly liable under any of the Third through Sixth Causes of Action.

246.     At the time of the wrongs alleged herein, because Armstrong is the founder and CEO of both Coinbase Global and Coinbase, Inc., Armstrong had the power and authority to direct the management and activities of Coinbase and its employees, and to cause Coinbase to engage in the wrongful conduct complained of herein. Armstrong, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase.

247.     Armstrong purposefully exercised his power and influence to cause Coinbase to violate the Exchange Act as described herein, including by (1) operating unregistered exchanges and, in the course of operating such exchanges, entering unlawful contracts to sell Tokens and to receive transaction fees for sales of Tokens, in violation of section 5(e) of the Exchange Act, 15 U.S.C. § 78e; and (2) operating as an unregistered broker-dealer, and, in the course of so operating,

entering unlawful contracts to sell Tokens and to receive transaction fees for sales of Tokens, in violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

248. At the time of the wrongs alleged herein, Armstrong had sufficient influence to cause Coinbase either to register as an exchange and broker-dealer or to refrain from acts that are prohibited by the Exchange Act for persons not registered as an exchange and broker-dealer. Armstrong purposefully decided not to do so.

249. Armstrong knowingly and culpably participated in, and/or aided and abetted, Coinbase's violations of the Exchange Act alleged herein.

250. Accordingly, Armstrong is jointly and severally liable for the violations of the Exchange Act by Coinbase complained of herein and is liable to Plaintiff for rescission and/or damages as to all transactions in which Plaintiff purchased, on any Coinbase Exchange, any Token that they later sold at a loss.

## XI.           EIGHTH CAUSE OF ACTION

**Offer or Sale of Unqualified Securities**
**Cal. Corp. Code §§ 25110, 25130, and 25503**
**(By Plaintiff Against All Coinbase Global and Coinbase, Inc.)**

251. Plaintiff realleges and incorporates the allegations above.

75

COMPLAINT FOR DAMAGES           Case No:

252.    This Cause of Action is brought on by Plaintiff, because he bought or sold Tokens on the Coinbase Exchanges in California.

253.    The California Corporate Securities Law of 1968 ("California Securities Act") forbids the offer or sale of unqualified securities. Cal Corp. Code §§ 25110, 25130. Any person who offers or sells a security in violation of section 25110 or 25130 is "liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned. Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." *Id.* § 25503.

254.    A security includes, *inter alia*, an "investment contract." *Id.* § 25019.

255.    The Tokens are, and at all relevant times have been, securities within the meaning of the California Securities Act. *Id.* § 25019. The Tokens were neither qualified under the California Securities Act nor exempt from qualification. *Id.* §§ 25110, 25130.

256.     During the Material Period, Coinbase Global and Coinbase, Inc. offered or sold the Tokens to Plaintiff in California. Because of the structure of the Coinbase Exchanges, Coinbase Global and Coinbase, Inc. are in privity in every sale of a Token, including those by Plaintiff. Customers on Coinbase transact solely with Coinbase itself, and Coinbase is thus a seller of the Tokens.

257.     Moreover, in offering Tokens to Plaintiff in California, Coinbase Global and Coinbase, Inc. solicited these purchases, and in doing so were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

258.     Throughout the Material Period, Coinbase Global and Coinbase, Inc. directed the foregoing actions to California, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc. to users in California and received by users in California.

COMPLAINT FOR DAMAGES                         Case No:

259.    Accordingly, Coinbase Global and Coinbase, Inc. have violated the California Securities Act through their sale of unqualified securities.

260.    Plaintiff purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in California during the Material Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

**XII.**               **NINTH CAUSE OF ACTION**

**Sale of Securities by an Unregistered Broker-Dealer**
**Cal. Corp. Code §§ 25210 and 25501.5(a)**
**(By Plaintiff Against Coinbase Global and Coinbase, Inc.)**

261.   Plaintiff realleges and incorporates the allegations above.

262.   This Cause of Action is brought on by Plaintiff, because he bought or sold Tokens on the Coinbase Exchanges in California.

263.    The California Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law. Cal. Corp. Code § 25210.

264.   A "broker-dealer" includes "any person engaged in the business of effecting transactions in securities in [California] for the account of others or for that person's own account" and any "person engaged in the regular business of

issuing or guaranteeing options with regard to securities not of that person's own issue." *Id.* § 25044. A security includes, *inter alia*, an "investment contract." *Id.* § 25019.

265.   Coinbase Global and Coinbase, Inc. have operated as broker-dealers in California during the Material Period. Coinbase Global and Coinbase, Inc. have engaged in the business of effecting transactions in securities for the account of others by facilitating the sale of Tokens in exchange for compensation primarily in the form of transaction fees, including by marketing Tokens, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer Tokens to investors after payment. Coinbase Global and Coinbase, Inc. have engaged in the business of effecting transactions in securities for their own account by holding themselves out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over customers' Tokens, by providing customers with access to services allowing purchase of Tokens on credit, by having a regular turnover inventory of securities, by purchasing Tokens for accounts in their own name (often at a discount to the ICO price), and by selling Tokens from their inventory to investors for profit. All Tokens are, and at all relevant times have been, securities as defined by California law.

79

266.   Throughout the Material Period, Coinbase Global and Coinbase, Inc. directed the foregoing actions to California, including without limitation through solicitations directed by Coinbase Global and Coinbase, Inc. to users in California and received by users in California.

267.   Coinbase Global and Coinbase, Inc. have never registered or applied for registration as a broker-dealer under California law. Coinbase Global and Coinbase, Inc. do not qualify for any exemption from registration of broker-dealers under California law.

268.   Coinbase Global and Coinbase, Inc. have thus operated as unregistered broker dealers in violation of Cal. Corp. Code § 25210.

269.   In the course of operating as unregistered broker-dealers, Coinbase Global and Coinbase, Inc. have sold Tokens to Plaintiff in California. Coinbase Global and Coinbase, Inc. solicited Plaintiff in California to purchase these Tokens, and in doing so, were motivated at least in part by a desire to serve their own financial interests or the financial interests of owners of Tokens for sale on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. received a direct financial benefit, in the form of transaction fees, from each purchase of Tokens on the Coinbase Exchanges. Coinbase Global and Coinbase, Inc. further benefit from purchases of Tokens on the Coinbase Exchanges because such purchases support a

COMPLAINT FOR DAMAGES                          Case No:

liquid trading market for Tokens, which in turn makes the Coinbase Exchanges more attractive to investors and issuers.

270.    Under California law, any person who offers or sells a security in violation of Cal. Corp. Code § 25210 is liable to the purchaser for rescission of the sale, or if the purchaser no longer owns the security, for damages. *Id.* § 25501.5(a)(1). A purchaser who no longer owns the security is entitled to damages in an amount equal to the difference between: (i) the price at which the security was bought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the security by the purchaser. *Id.* § 25501.5(a)(4).

271.    Accordingly, Coinbase Global and Coinbase, Inc. have violated Cal. Corp. Code §§ 25210 and 25501.5(a).

272.    Plaintiff in California purchased Tokens on the Coinbase Exchanges and subsequently sold those Tokens at a loss seek damages, inclusive of transaction fees, as to each transaction in which any Token purchased in the Material Period was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

**XIII.**                    **TENTH CAUSE OF ACTION**

COMPLAINT FOR DAMAGES                    Case No:

**Control Person Liability for Violations of the California Securities Act**
**Cal. Corp. Code § 25504**
**(By Plaintiff Against Coinbase Global and Brian Armstrong)**

273.    Plaintiff realleges and incorporates the allegations above.

274.    Every person who directly or indirectly controls a person liable under the California Securities Act for unlawfully selling unqualified securities is "liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist." Cal. Corp. Code § 25504.

275.    At the time of the wrongs alleged herein, Coinbase Global controlled Coinbase, Inc. By virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, Coinbase Global had the power and authority to direct the management and activities of Coinbase, Inc. and its employees, and to cause Coinbase, Inc. to engage in the wrongful conduct complained of herein. Coinbase Global, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Coinbase, Inc.

276.    Coinbase Global purposefully exercised its power and influence to cause Coinbase, Inc. to violate the California Securities Act as described herein, including by selling unqualified securities in violation of Cal. Corp. Code §§

82

25110 and 25130. Coinbase, Inc. is liable under Cal. Corp. Code § 25503 for its sales of unqualified securities.

277.   At the time of the wrongs alleged herein, Coinbase Global had sufficient influence to cause Coinbase, Inc. to refrain from selling unqualified securities in violation of the California Securities Act. Coinbase Global purposefully decided not to do so.

278.   Coinbase Global knowingly and culpably participated in, and/or aided and abetted, Coinbase, Inc.'s violations of the California Securities Act alleged herein. Coinbase Global had knowledge of or reasonable ground to believe in the existence of the facts alleged herein, which form the basis for Coinbase, Inc.'s liability under Cal. Corp. Code § 25503.

279.   Accordingly, Coinbase Global is jointly and severally liable for the violations of Cal. Corp. Code §§ 25110 and 25130 by Coinbase, Inc. complained of herein and is liable to Plaintiff for damages, inclusive of transaction fees, as to each transaction in which any Token purchased in California during the Material Period was subsequently sold at a loss. *See* Cal. Corp. Code § 25503.

280.   With respect to Coinbase Global, the instant claim is pleaded in the alternative to the extent that Coinbase Global is found not to be directly liable under either the Eighth or Ninth Causes of Action.

281.    At the time of the wrongs alleged herein, Armstrong controlled both Coinbase Global and Coinbase, Inc. As CEO and founder of both entities, Armstrong was a principal executive officer of both entities.

282.    Armstrong knew of Coinbase's violations of Cal. Corp. Code §§ 25110 and 25130 because he was aware both of Coinbase's lack of appropriate registration and the fact that Coinbase was selling the Tokens.

283.    Accordingly, as a "principal executive officer" of a liable corporation who had knowledge of the facts by which liability is alleged to exist, Armstrong is jointly and severally liable for the violations of Cal. Corp. Code §§ 25110 and 25130 by Coinbase, Inc. complained of herein and is liable to Plaintiff for damages, inclusive of transaction fees, as to each transaction in which any Token purchased in California during the Material Period was subsequently sold at a loss. *See* Cal. Corp. Code § 25503.

## XIV.            <u>ELENTH CAUSE OF ACTION</u>

**For Fraud in the Inducement, Misrepresentation, Concealment, Manipulation and Embezzlement**
**(By Plaintiff Against All named defendants)**

284.    Plaintiff realleges and incorporates the allegations above.

285.    On or about November 16, 2021 Plaintiff  invested about $ 47,000 in his basic Coinbase account and about $ 25,000 in his Coinbase Pro account,

COMPLAINT FOR DAMAGES                                    Case No:

Plaintiff had been researching a "Token" named "Gyen" that was introduce by Coinbase to Plaintiff, Coinbase stated that Gyen was a stable coin and it was fully backed by the Japanese Yen. Plaintiff reasonably relied on those representations and invested all his funds in both accounts on the Gyen Token.

286.   On 11/17/2021 Plaintiff bought GYEN coin in his Coinbase basic account, he had 4,424,754.724706 GYENS Tokens, On or around November 19, 2021 Plaintiff discovered he have realized a big gain when GYEN Token surged to $ 0.0313 from the initial price of $ 0.0090 at that time his balance was $ 64,601.41 the gains represented 360% profits over his initial investment.

287.   On or about November 17, 2021 through his Coinbase Pro account Plaintiff invested $ 25,000 on GYEN token at the price of $ 0.0090 later on or around November 19, 2021 GYEN Token surged to the price of $ 0.0313 at that time Plaintiff realized big gains of over $ 60,300.00

288.   On November 19,2021 Plaintiff noticed he had realized big gains in both accounts and he quickly set orders to sell his trades of GYEN Token, to his surprise the webpage did not work; Plaintiff, full of anguish tried several times to sell his trade but the system failed every time, at some point the GYEN Token started to drop and eventually crashed. Coinbase displayed a message in the screen stating as follows:

 *Account Restricted, You are currently unable to send crypto on   Coinbase. Please visit" https://support.coinbase.com for assistance.*

85
_____

COMPLAINT FOR DAMAGES                                    Case No:

289.   Plaintiff's accounts were suspended, his access restricted and his funds were lockout by Coinbase, Plaintiff's trading data was deleted from his accounts by Coinbase. Plaintiff was denied access to his funds, his gains and the opportunity to continue successfully trading other Tokens for big gains.

290.   Coinbase fraudulently manipulated Plaintiff's accounts by suspending his trades and the ability to sell his trades as he so wished to do so, Coinbase also manipulated and deleted information of his funds and gains and denied Plaintiff the opportunity to sell his trades to cash out his gains, Coinbase lockout Plaintiff's funds and remain lockout for a long period of time denying Plaintiff the opportunity to continue successfully trading.

291.   Flores' account was suspended/ restricted by Coinbase and his funds were locked out. Coinbase was manipulating Flores funds by changing the numbers constantly. Flores was negated his funds, his gains and the opportunity to continue successfully trading other coins for big gains.

292.   On or around 11/19/2021 Flores' funds were locked out, all because Apparently Coinbase Pro software failed or was intentionally disabled to keep clients from selling the asset to their detriment. and not only that Flores loss his funds but he was also negated the opportunity to make more money by trading

86

other coins. Flores was denied access to his funds and therefore negated the opportunity to profit by trading other coins and tokens.

## XV.  THE ARBITRATION CLAUSE IS UNENFORCEABLE

293.   Defendants argued that Flores must resolve all of his trading issues with Defendants through mediation as stated in the "User Agreement arbitration clause" Flores argues herein that the clause for arbitration in the "user agreement" and the user agreement itself are not enforceable for the following reasons:

- There was no mutually of agreement to arbitration.

- This was a contract of adhesion, and Flores was not made aware of the contractual provisions for arbitration.

- There was no meeting of the minds, no mutuality, and no fundamental fairness.

- There was no dedicated page addressing arbitration, the Coinbase website was confusing and misleading.

- The arbitration agreement does not contain a unilateral modification provision.

- The arbitration clause is Substantive unconscionability.

COMPLAINT FOR DAMAGES                              Case No:

- The arbitration agreement is oppressive.

- The arbitration agreement is in violation of California's implied covenant of good faith and fair dealing.

Pursuant to Section 2 of the Federal Arbitration Act, an agreement to submit a dispute to arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." The savings clause concluding Section 2 recognizes that arbitration agreements are subject to general contract principles. *AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011).*

Under the Act, a district court determines the two gateway issues of "whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue." *Lifescan, Inc. v. Premier Diabetic Servs., Inc., 363 F.3d 1010, 1012 (9th Cir. 2004).* But the parties to an arbitration agreement can further agree to arbitrate these gateway issues so long as the delegation is "clear and unmistakable.*" Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 69 n.1 (2010).* "Where a delegation provision exists, courts first must focus on the enforceability of that specific provision, not the enforceability of the arbitration agreement as a whole." *Brice v. Haynes Invs., LLC, 13 F.4th 823, 827 (9th Cir. 2021).* Under California law, a contract provision is unenforceable if it was "unconscionable at the time it was made." Cal. Civ. Code § 1670.5(a); see also

88

_____

*Circuit City Stores, Inc. v. Adams, 279 F.3d 889, 892 (9th Cir. 2002).*

Unconscionability has both procedural and substantive elements. These elements are analyzed on a sliding scale: the more substantively unfair, the less procedurally unconscionable a provision need be for a finding it is unenforceable, and vice-versa. *Sanchez v. Valencia Holding Co., 61 Cal. 4th 899, 910 (2015).* The party resisting arbitration bears the burden of demonstrating unconscionability. *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC, 55 Cal. 4th 223, 246–47 (2012).*

## A.    Unconscionability

294.   Under California law, substantive unconscionability relates to the fairness of an agreement's actual terms and assesses whether they are overly harsh or one-sided. Substantively unconscionable contract terms will shock the conscience. See Pinnacle, 55 Cal. 4th at 246. A delegation clause "may be found substantively unconscionable where it imposes an unfair burden that is different from the inherent features and consequences of delegation clauses*." Pinela v. Neiman Marcus Grp., Inc., 238 Cal. App. 4th 227, 246 (2015)* (citation omitted); see also *Rent-A-Center, 561 U.S. at 68-69.*

A delegation clause lacking mutuality imposes an unfair burden that qualifies as unconscionable. "The paramount consideration in assessing substantive conscionability is mutuality." *Nyulassy v. Lockheed Martin Corp., 120 Cal. App.*

89

*4th 1267, 1281 (2004)* (cleaned up, citation omitted). In other words, to be enforceable, a delegation provision, as well as an arbitration agreement generally, must have a "modicum" of bilaterality. See *Armendariz v. Found. Health Psycare Servs., Inc., 24 Cal. 4th 83, 117 (2000)*.

Coinbase's user agreement contains a clear and unmistakable delegation clause that is expressly anchored in the defined term "<u>Arbitration Agreement</u>": See Exhibit A.

> This Arbitration Agreement includes, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement. All such matters shall be decided by an arbitrator and not by a court or judge.

295.   The delegation clause as a whole does not generally delegate the arbitrability of all disputes between Coinbase and its users to the arbitrator. Rather, it specifically delegates arbitrability of the "Arbitration Agreement," an expressly defined term in the user agreement. Defined terms are given their defined meaning. Coinbase's user agreement, as defined by Coinbase, means what it says and that the defined terms therein govern its interpretation. See *Turlock Irrigation Dist. v. FERC, 903 F.3d 862, 872 (9th Cir. 2018); Pemberton v. Nationstar Mortgage LLC, 331 F. Supp. 3d 1018, 1037-38 (S.D. Cal. 2018)* (Judge Cynthia Bashant); *Facebook, Inc. v. Rankwave Co., Ltd., 2019 WL 8895237, at \*4 (N.D. Cal. Nov. 14, 2019)* (Judge Jon S. Tigar*); Kanno v. Marwit Cap. Partners II, L.P., 18 Cal. App. 5th 987, 1011-12 (2017).*

COMPLAINT FOR DAMAGES                    Case No:

296.    Consequently, whether the delegation clause imposes an unconscionable burden that differs from a generic delegation clause requires backtracking through the nested provisions of Coinbase's "Arbitration Agreement" and the tripartite dispute resolution procedure it sets out. From the delegation clause, we must proceed to the arbitration provision itself, which defines "Arbitration Agreement":

> If we cannot resolve the dispute through the Formal Complaint Process, you and we agree that any dispute arising out of or relating to this Agreement or the Coinbase Services . . . shall be resolved through binding arbitration, on an individual basis (the "Arbitration Agreement")

(User Agreement § 8.3, emphasis omitted). The defined term "Arbitration Agreement" incorporated into the delegation clause thus explicitly includes the precondition of engagement in the "Formal Complaint Process," another defined term. The Formal Complaint Process is laid out in Section 8.2 of the user agreement (emphasis omitted):

> Formal Complaint Process. If you have a dispute with Coinbase (a "Complaint"), you agree to contact Coinbase through our support team to attempt to resolve any such dispute amicably. If we cannot resolve the dispute through the Coinbase support team, you and we agree to use the Formal Complaint Process set forth below. You agree to use this process before filing any arbitration claim or small claims action. If you do not follow the procedures set out in this Section before filing an arbitration claim or suit in small claims court, we shall have the right to ask the arbitrator or small claims court to dismiss your filing unless and until you complete the following steps.

COMPLAINT FOR DAMAGES                    Case No:

297.   The Formal Complaint Process thus includes its own antecedent requirement of an informal attempt to resolve the complaint with Coinbase's support team. Should that fail to resolve the issue, the formal process requires users (upon pain of dismissal) to file a complaint form, upon which, within fifteen business days (and no later than thirty-five business days), Coinbase will: (1) resolve the dispute as requested; (2) reject the complaint and explain why; or (3) provide an alternative solution (id. §§ 8.2.1, 8.2.2).

To sum up then, like nesting boxes, the delegation clause incorporates several defined terms that specify the matters delegated to the arbitrator. The defined terms outline the user agreement's tripartite dispute resolution procedure. *First*, the user must contact Coinbase's support team. *Second*, should that fail, upon pain of dismissal, the user must pursue the formal complaint process. *Third*, should that process fail to resolve the grievance then, and only then, may the consumer seek arbitration.

298.   The plain language of the informal and formal complaint procedures prior to arbitration only contemplates complaints raised by the consumer, not by Coinbase. The informal complaint process specifies "If you have a dispute with Coinbase (a "Complaint"), you agree to contact Coinbase" (User Agreement § 8.2, emphasis added). The formal complaint process states that, if the informal process fails, "you and we agree to use the Formal Complaint Process set forth below"

92

(ibid., emphasis added). But only the user is required to file a formal complaint upon pain of dismissal, and the procedures for handling a formal complaint outlined in the agreement anticipate only a user's complaint and Coinbase's eventual response, not the reverse scenario.

299.   The "Arbitration Agreement" in the user agreement imposes no obligation on Coinbase to arbitrate. Using a litigation gimmick, Coinbase contends that the arbitration agreement itself is "explicitly bilateral", pointing to the language "you and we agree that any dispute arising out of or relating to this Agreement or the Coinbase Services . . . shall be resolved by binding arbitration" (User Agreement § 8.3). But Coinbase conspicuously ignores the introductory clause preceding the very language it cites. The full sentence states: "If we cannot resolve the dispute through the Formal Complaint Process, *you and we agree* that any dispute arising out of or relating to this Agreement or the Coinbase Services . . . shall be resolved by binding arbitration, on an individual basis (the "Arbitration Agreement")" (ibid., emphasis added). Coinbase noted the latter clause multiple times in the hearing. Not once, however, did counsel acknowledge the preceding clause, opting to simply start in the middle of the sentence.

The arbitration provision as a whole addresses only those disputes that have previously gone through the pre-arbitration complaint procedure. Because only Coinbase users can raise a complaint though the pre-arbitration complaint

93

COMPLAINT FOR DAMAGES                                    Case No:

procedure, the arbitration provision imposes no obligation on Coinbase itself to submit its disputes with users to binding arbitration. Two further points support this conclusion.

*First*, Coinbase's interpretation renders the first clause of the arbitration provision surplusage. This is problematic especially because the first clause contains a defined term and informs the meaning of the second clause of the sentence, the clause that Coinbase relies upon. "[W]hen courts construe an instrument, a judge is not to insert what has been omitted, or to omit what has been inserted." *Edwards v. Arthur Andersen LLP, 44 Cal. 4th 937, 954 (2008)* (quotation omitted); see also *U.S. v. 1.377 Acres of Land, 352 F.3d 1259, 1265-66 (9th Cir. 2003); Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc., 971 F.2d 272, 278-79 (9th Cir. 1992).*

*Second*, the rest of Section 8.3 (like the first clause that Coinbase ignores) only imposes obligations on the user. The arbitration provision continues:

> Subject to applicable jurisdictional requirements, you may elect to pursue your claim in your local small claims court rather than through arbitration so long as your matter remains in small claims court and proceeds only on an individual (non-class and non-representative) basis. Arbitration shall be conducted in accordance with the American Arbitration Association's rules for arbitration of consumer-related disputes.

(User Agreement § 8.3, emphasis omitted). The further specifics described in this passage do not say the user and Coinbase may elect to pursue their claim in small

94

claims court. It singles out the user once again and subjects them to the low-dollar limits of small claims court. Thus, Coinbase would interpret Section 8.3 to at first apply only to the user (the informal and formal complaints), then apply to both parties (arbitration), and then go back to only applying to the user (small claims court). This variable interpretation is untenable. A plain reading of the user agreement, in contrast, construes the "Arbitration Agreement," as defined by Coinbase, to be explicitly conditioned upon use of the "Formal Complaint Process," and only users must submit to that procedure. Because the delegation clause imposes no requirements on Coinbase, it lacks the requisite modicum of bilaterality.

Although the user agreement lacks mutuality, the analysis continues. The California Supreme Court has "confirmed that a one-sided contract is not necessarily unconscionable." *Tompkins v. 23andMe, Inc., 840 F.3d 1016, 1030-31 (9th Cir. 2016)*. Pre-arbitration dispute procedures can recite legitimate "extra protection" for the stronger party and present "laudable" mechanisms to resolve disputes informally. Pretextual or unduly onerous preconditions to arbitration, however, remain substantively unconscionable. *See Baltazar v. Forever 21, Inc., 62 Cal. 4th 1237, 1250 (2016); Nyulassy, 120 Cal. App. 4th at 1282-83.*

An unconscionability determination is highly context-specific, where the context "includes both the commercial setting and purpose of the arbitration

95

contract and any procedural unconscionability in its formation." *OTO, LLC v. Kho, 8 Cal. 5th 111, 136 (2019)*; see also *De La Torre v. CashCall, Inc., 5 Cal. 5th 966, 984 (2018)*. As discussed, Coinbase's tripartite complaint process requires users to jump through multiple, antecedent hoops before initiating arbitration. This analysis pauses to note the agreement also mentions a separate "hotline" for users to call if their account is compromised, a further checkbox for a user who has seen their account drained. There is no legitimate commercial need for this many burdensome obstacles prior to arbitrating disputes relating to a basic user agreement for services like those provided by Coinbase. See *Armendariz, 24 Cal. 4th at 117-18; Pokorny, 601 F.3d at 998-1000*. The lack of mutuality in Coinbase's complaint process is expressly incorporated into the delegation clause via defined terms. In other words, the delegation clause only delegates questions of arbitrability that emerge from the user agreement's tripartite dispute-resolution procedure, not arbitration, generally. Because the delegation clause imposes an onerous, unfair burden beyond that of a typical delegation clause, therefore it is substantively unconscionable.

Procedural unconscionability addresses the circumstances of contract negotiation and formation and concentrates on two factors: oppression and surprise. *Pinela, 238 Cal. App. 4th at 243.* "Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly

COMPLAINT FOR DAMAGES                                    Case No:

unconscionable provision is hidden within a prolix printed form." *Morris v. Redwood Empire Bancorp, 128 Cal. App. 4th 1305, 1317 (2005)* (quotation and citation omitted).

300.   *First*, considering oppression, the user agreement here clearly qualifies as a contract of adhesion — a "standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Pinela, 238 Cal. App. 4th at 242* (quotation omitted). Coinbase drafted and presented the user agreement to **Flores** on a take-it-or-leave-it basis, which deprived him of both the ability to negotiate and meaningful choice.

*Second*, under the prevailing law, consumers can be forced to arbitrate even federal claims that Congress has expressly authorized for the federal district court. But even though a federal claim for relief can be forced into arbitration, the "right" to arbitrate may not be further conditioned on onerous procedural preconditions, as here employed. For example, the user agreement recites: "If you do not follow the procedures set out in this Section before filing an arbitration claim or suit in small claims court, we shall have the right to ask the arbitrator or small claims court to dismiss your filing unless and until you complete the following [pre-arbitration complaint] steps" (User Agreement § 8.2). This is a broad prohibition on access to

97

---

COMPLAINT FOR DAMAGES                                    Case No:

formal resolution procedures would surprise the average consumer for this type of service.

Again, the procedural unconscionability of the user agreement's dispute resolution procedure is expressly incorporated into the delegation clause. Coinbase does not contest the user agreement contains at least some level of procedural unconscionability. Therefore, given the level of substantive unconscionability inherent in the delegation clause previously discussed, the level of procedural unconscionability merits the finding that the delegation clause is unconscionable and, thus, unenforceable.

Having found the delegation clause unenforceable, the court must consider whether the arbitration agreement as a whole is unenforceable. See *Pinela, 238 Cal. App. 4th at 250.* The court of appeals has stated that "*Rent-A-Center* contemplate[d] that a delegation provision may be unenforceable for the same reason as the broader arbitration agreement." *Brice, 13 F.4th at 827.* Because of the manner in which Coinbase crafted its user agreement, all the analysis above regarding the delegation clause applies to the arbitration agreement, generally. See *Saravia v. Dynamex, Inc., 310 F.R.D. 412, 422 (N.D. Cal. 2015).* The "Arbitration Agreement" imposes a burdensome and unfair pre-arbitration dispute process on users and sends their complaints, but not Coinbase's complaints, to binding

COMPLAINT FOR DAMAGES                                Case No:

arbitration. Therefore, the arbitration agreement as a whole is unconscionable and, hence, unenforceable.

### B.   Severance.

301.   Finally, having determined that the delegation clause and the arbitration provision as a whole are unconscionable, the court must consider the possibility of severance.

California Civil Code Section 1670.5(a) provides:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

In Armendariz, the California Supreme Court explained: "the statute appears to give a trial court some discretion as to whether to sever or restrict the unconscionable provision or whether to refuse to enforce the entire agreement. But it also appears to contemplate the latter course only when an agreement is `permeated' by unconscionability." 24 Cal. 4th at 122.

Here, unilaterality pervades both the delegation clause and the arbitration agreement as a whole. As explained above, the relevant provisions of the user agreement's dispute resolution procedure employ defined terms such that the

COMPLAINT FOR DAMAGES                                    Case No:

various provisions outlining the informal complaint, formal complaint, and arbitration procedures are nested one inside the other. The formal and informal complaint processes precondition arbitration. Unilaterality, accordingly, permeates the whole. The arbitration agreement is "simply too tainted to be saved through minor adjustments." *Pokorny, 601 F.3d at 1005*.

302.   Coinbase would have strike the phrase "If we cannot resolve the dispute through the Formal Complaint Process," which would leave: "[Y]ou and we agree that any dispute arising out of or relating to this arbitration agreement . . . shall be resolved through binding arbitration, on an individual basis (the "Arbitration Agreement")". In effect, Coinbase itself defined, "Arbitration Agreement." As explained above, defined terms govern the interpretation of the contract, so this change would rewrite the dispute resolution procedure the user agreement sets out. This order "strive[s] to interpret the parties' agreement to give effect to all of a contract's terms*." Brandwein v. Butler, 218 Cal. App. 4th 1485, 1507 (2013)* (emphasis added). Coinbase's suggestion is a non-starter and the inability to cleanly remove the unconscionable language weighs against severance. See *Pinela, 238 Cal. App. 4th at 256*. Coinbase's revision, moreover, would have little efficacy: another provision in the contract similarly requires the user "to agree to use this [pre-arbitration] process before filing any arbitration claim or small claim action" (User Agreement ¶ 8.2). The inclusion of the requirement for users to

COMPLAINT FOR DAMAGES                                    Case No:

engage in an onerous pre-arbitration procedure in multiple provisions further indicates that severance is not possible here. See *Nyulassy, 120 Cal. App. 4th at 1287*. The Coinbase's provisions would be binding only in this case and would leave Coinbase free to insist on its burdensome and one-way preconditions in all other cases. In short, severance is not feasible.

303.   Defendants and each of them also acted with oppression, fraud, or malice as defined by California Civil Code section 3294 and engaged in highly reprehensible and despicable conduct warranting exemplary damages.

**XVI.**                           **PRAYER FOR RELIEF**

304.   WHEREFORE, Plaintiff, prays for judgment against Defendants as to each and every count, including:

a).   An order declaring that Defendants' actions, as set forth above, constitute violations of the federal and state laws set forth above and that Defendants are liable to Plaintiff, as described herein, for damages arising therefrom;

b).   An injunction enjoining Coinbase from offering the Tokens for purchase or sale on the Coinbase Exchanges without having registered the Coinbase Exchanges as national securities exchanges or broker-dealers as required by the federal securities laws.

COMPLAINT FOR DAMAGES                           Case No:

c).     An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Coinbase from continuing the unlawful practices alleged herein, and injunctive relief to remedy Coinbase's past conduct;

d).     A judgment awarding Plaintiff, all appropriate damages, in an amount to be determined at trial but not less them $ 1, 580,000.00

e).     A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, rescission, restitution, and disgorgement.

f).     A judgment awarding Plaintiffs prejudgment and post-judgment interest, as permitted by law, of 7% for a daily amount of $ 158.80 from 11/19/2021 till resolve.

g).     A judgment awarding Plaintiff, costs and fees, including attorneys' fees, as permitted by law.

h).     A judgment for expected returns on investment; and

i).     Grant such other legal, equitable or further relief as the Court may deem just and proper.

102

j).    Plaintiff reserves the right to seek punitive damages against all named

defendants in the amount to be prescribe by the court to punish and deter

defendants from ever engaging in those acts as stated above.

## XVII.        DEMAND FOR PUNITIVE DAMAGES

305.    A Judgment for exemplary punitive damages to deter defendants from

ever engaging in unlawful acts.

## XVIII.         DEMAND FOR JURY TRIAL

306.    Plaintiff demand a trial by jury for all issues so triable.

Respectfully submitted at Sherman Oaks, California.

Dated: October 23, 2022

By:   /s/   Jose Flores

Jose Flores
Plaintiff in Pro Se

103

_____

COMPLAINT FOR DAMAGES                              Case No: